740 A.2d 662 (1999)
326 N.J. Super. 59
Helen SVARNAS, Plaintiff-Appellant,
v.
AT & T COMMUNICATIONS and Regina Somerruk, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted October 20, 1999.
Decided November 15, 1999.
*664 Shea & Novy, Toms River, for plaintiff-appellant (Robert C. Shea, of counsel; Peter A. Loffredo and Michael C. Paxton, on the brief).
Collier, Jacob & Mills, Somerset, for defendants-respondents (Patricia S. Robinson, of counsel and on the brief).
Before Judges KING, PAUL G. LEVY and LEFELT.
*663 The opinion of the court was delivered by KING, P.J.A.D.

I
Plaintiff, a telephone operator, was terminated from her employment with defendant AT & T Communications after twenty-two years of service. The company's stated reason was her excessive absenteeism. She had been warned about this on many occasions. Following her dismissal, she sued the company and her supervisor, Regina Somerruk, under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -42 (the LAD), claiming discrimination because of her asthma condition and for suffering from bodily injuries sustained in a motor vehicle accident. The Law Division judge granted summary judgment to defendants.
The issue on appeal is whether an employer is required to accommodate through toleration an employee's chronic, sporadic, and excessive absenteeism, if the absences are related to a disability or handicap recognized under the LAD. Plaintiff claims that the company used her absenteeism as a pretext for its unwillingness to accommodate her part-time work schedule and her *665 desire for a smoke-free work environment. We conclude that the Law Division judge properly granted summary judgment to defendants and affirm.

II
On October 11, 1995 plaintiff Helen Svarnas filed a twelve-count complaint in Superior Court, Law Division, Monmouth County, against defendants AT & T Communications and Regina Somerruk. The complaint sought compensatory and punitive damages for wrongful termination, disability discrimination under the federal Rehabilitation Act and Americans with Disabilities Act (ADA), disability and gender discrimination under the LAD, intentional and negligent infliction of emotional distress, violations of the State constitution, outrageous conduct, retaliatory discharge, and negligent conduct by AT & T and its agents.
Plaintiff had started working for AT & T, then New Jersey Bell, on February 9, 1971. She began as a telephone operator in Asbury Park and became a member of the collective bargaining unit of the Communication Workers of America. When the Asbury Park office closed in 1974, she went to work in Neptune. She stayed in the Neptune office until 1982 when employees were given the option of transferring to a new location in Freehold. She claimed that she wanted the transfer because the Neptune office was moldy and mildewed due to its underground location. She suffered from asthma and was also an insulin-dependent diabetic.
In 1986, while at Freehold, plaintiff requested and was denied a hardship transfer to Florida. She sought the transfer on the advice of her doctor because of the cold weather conditions in New Jersey and the air quality in the Freehold office. She admitted that, in order to qualify for such a transfer, an employee needed satisfactory attendance and performance. She also admitted that the reason for the denial was her poor attendance record. Although plaintiff filed a grievance with the union, the union did not pursue it.
Subsequent requests for a transfer were similarly denied by the company. Finally, in 1990, plaintiff's request for a transfer to Florida was granted. However, because she was given only two weeks to move and her father was ill, she turned the transfer down.
In March 1990 plaintiff applied for and was granted the title of service assistant. She said that the company overlooked her attendance record when granting her this promotion. In 1990 plaintiff was transferred to AT & T's Howell office. In 1992, when that office closed, everyone was transferred to Mercerville. On October 25, 1993 plaintiff was terminated from employment for overall career unsatisfactory attendance.
AT & T's records showed that between 1971 and 1993 plaintiff had 121 incidents of absences, for a total of 188.5 days. She also had eleven disabilities (absences of more than eight consecutive days) totalling 477.5 days of absence. She received a two-day suspension in July 1985 and had discussions with her supervisors about her unsatisfactory attendance on February 2, 1987; February 24, 1988; April 25, 1988; September 7, 1988; October 24, 1989; April 11, 1990; May 30, 1991; January 21, 1992, and October 14, 1992.
According to defendant Somerruk, plaintiff's manager on the date she was terminated, and Julia Sanders, another first-level manager in the office where plaintiff worked, AT & T's policy for the job required satisfactory attendance. This meant being at work every scheduled day, without any leeway for absences. When an employee was out for five or six days in any twelve-month period, she would be considered as trending towards unsatisfactory, regardless of the reason, and would be counseled. A suspension, and then dismissal, could follow a warning. However, each individual's circumstances would be considered before any action was taken, *666 and an employee's entire attendance record would be reviewed.
Any absence beyond eight consecutive days was considered a disability and would be referred to a disability case manager. The case manager had the duty to insure that employees out on disability were receiving adequate care and were truly disabled. Employees were entitled to a maximum of fifty-two weeks of short-term disability, depending on their length of service. Employees could be terminated while absent on sickness disability. Employees could lose their medical disability certification if no longer totally disabled, by not maintaining proper and adequate care, by not appearing for scheduled independent medical examinations, or by absence from home without the company's permission.
The record here shows that on February 2, 1987 plaintiff's supervisor spoke to her about her absence of four days in one month, for two separate incidents. On February 24, 1988 plaintiff was told that her attendance record was approaching unsatisfactory. On April 25, 1988 she was advised that her attendance was questionable because she had been absent twenty-five days in twelve months on seven separate occasions.
On September 7, 1988 plaintiff was warned about absence for 28½ days in one year, one disability period, and seven incidental absences. She was told that her next absence could result in disciplinary action, up to and including dismissal. By October 24, 1989 plaintiff had eight additional incidental absences, for a total of 13½ days. Again she was warned that if she had any further incidental absences she would be dismissed. The validity of her illnesses was not questioned, only her dependability and overall ability to come to work when scheduled. Also at this meeting, plaintiff was counseled regarding her health and steps she could take to prevent further illness and disability.
On April 11, 1990 plaintiff had another disciplinary discussion regarding her attendance. She was given another "final warning," and told that the only reason she was not being terminated despite her absence the previous day was because she had not been absent for five months. However, she was told that the next occurrence could result in dismissal.
On May 30, 1991 plaintiff was informed that her attendance record was unsatisfactory and that good attendance was a condition of employment. On January 21, 1992 she was told that failure to maintain satisfactory attendance may result in disciplinary action up to and including dismissal. As of that date, she had one disability period totalling thirty days of absence and seven incidental absences totalling 8½ days.
On October 14, 1992 plaintiff was told that she had five incidents of absences in the prior twelve months, totalling 15.7 days. Her supervisor reviewed the company's attendance guidelines with her and advised her that immediate improvement was necessary. The next incident of absence would subject her to disciplinary action up to and including dismissal.
Plaintiff was in a car accident on October 9, 1992. She was absent on October 10 and 11 and returned to work on October 12, 1992. Beginning on November 1, 1992, she went on disability leave. Plaintiff's doctor diagnosed a lumbar sprain and cervical problems and estimated her return-to-work date as December 1, 1992. According to the report of Dr. Amos Katz, dated November 16, 1992, plaintiff complained of headaches, burning in the posterior neck, nausea, vomiting, pain and numbness in her shoulders, and lower back pain. Katz sent plaintiff for physical therapy and gave her medication.
The disability case manager assigned to plaintiff was Edna MacKemull, who contacted plaintiff periodically in order to check on her progress. In February 1993 MacKemull informed plaintiff that she would have to see a doctor selected by AT & T. This doctor found plaintiff disabled *667 and estimated she would be able to return to work on March 23, 1993. Another independent medical exam was scheduled for March 30, 1993. Plaintiff was found able to return to work as of April 1, 1993.
On April 2, 1993 plaintiff called MacKemull, disagreeing with this assessment. MacKemull agreed to carry her medical certification through April 4, and told her she would be expected to return to work on April 5, 1993. Although Dr. Katz was against plaintiff's return to work, he agreed to restricted duty. MacKemull agreed to let plaintiff start working half-days and discussed with her ways she could move around at work in order to avoid stiffness and soreness.
Plaintiff returned to work on April 5, 1993 working four hours per day. Her supervisor, Andrews, informed her that she was owed one week's vacation and that she could either take it then or lose it. She opted to take it. When plaintiff returned from vacation, she again worked half-days. Because she was in a lot of pain, she asked for an extension of the restricted duty. This was approved and she worked half-days through May 10, 1993.
On May 12, 1993 plaintiff was in excruciating pain at work. She was sent to AT & T's medical department in Holmdel and was seen by Dr. Jyothsna Shastry who concluded that she was unable to work and should be on disability leave. Dr. Shastry also recommended that plaintiff see Linda King, a psychotherapist in AT & T's employee assistance program, because plaintiff was suffering from depression and having crying spells.
MacKemull was again assigned to be plaintiff's disability manager. MacKemull monitored plaintiff's progress throughout the summer of 1993. In July 1993 she was admitted to the hospital for cervical traction. She felt that she was harassed by MacKemull's constant calls and that she was pressured to return to work before she was ready. She claimed that MacKemull called her as often as four to five times a month.
On October 13, 1993 plaintiff advised MacKemull that her doctor was allowing her to return to work and requested half-days for the first two weeks back. In addition, plaintiff's doctor indicated that she needed to work in a smoke-free environment. According to plaintiff, AT & T's workplace, but not its cafeteria, was smoke-free. In addition, everyone smoked in the ladies' room even though it was designated a non-smoking area. Although plaintiff had complained on earlier occasions about this to her union representative, nothing was ever done about it. MacKemull called Somerruk to make sure that plaintiff's environment would be smoke-free. Somerruk assured her it was and also agreed to accommodate plaintiff's request for half-days.
Plaintiff returned to work on October 25, 1993. That morning, Somerruk summoned her to a small conference room. Another group manager and a union representative were also present. According to plaintiff, Somerruk said she was being terminated due to her overall unsatisfactory attendance record. Plaintiff became extremely upset and started to hyperventilate. When she said that she did not have a way to get home because she had car-pooled that day, Somerruk told her to take a taxi. She claimed that she was humiliated and that Somerruk looked at her like she was a "piece of dirt." When she arrived home later that day, she was still hysterical and on the edge of a nervous breakdown. Her doctor prescribed a tranquilizer and she started seeing a psychotherapist three times a week. As of the date of her deposition in October 1996, plaintiff was working part-time for a physician.
Plaintiff maintained that the number of total career absences shown on AT & T's records 673.6 days was inaccurate because the company had mistakenly included days she took to attend funerals and for work-stoppages. She claimed that the figures *668 were off by two months or more. Although she brought her dispute to the union, the union refused to challenge AT & T's figures and refused to arbitrate the grievance. Plaintiff's union representative told her that the union would not take the dispute to arbitration because "they didn't think they had a leg to stand on." Plaintiff conceded that her job required her to be physically present in the office. She described AT & T's attendance policy as: "Don't get sick."
Although plaintiff argued, in opposition to the motion for summary judgment, that she was handicapped because of her asthma and because of the bodily injuries she sustained in her car accident, she maintained at her deposition that her only disability was asthma and that she was terminated because of this disability. She claimed that the company refused to accommodate her asthma as it accommodated other employee illnesses, such as alcoholism and drug addiction. She said that many employees with alcohol problems had taken leaves or had poor attendance records but were never reprimanded. Other than "time off," however, plaintiff never really defined what reasonable accommodation she was seeking.
Plaintiff also admitted that many of her absences were not asthma-related. For example, her disability leave from December 13, 1977 to February 6, 1978, was due to gall bladder surgery; her disability leave from December 8, 1991 to January 20, 1992, was for pneumonia; and her disability leaves from November 1, 1992 to April 5, 1993, and from May 13, 1993 to October 25, 1993, were due to injuries sustained in the car accident. In addition, she missed time from work in 1989 and 1990 due to such illnesses as a cornea abrasion and infection, the flu, a sore throat, an upper respiratory infection, gum surgery, and migraine headaches, among other things. Although migraine headaches and the flu could be attributed to her asthmatic condition, she conceded that many of the other illnesses that caused her absences over her twenty-two-year career with AT & T were not related to her asthma in any way. She also claimed that if it were not for the 1992 car accident, she might still have her job.
Plaintiff further admitted that having asthma did not prevent her from functioning normally. Problems arose only when she had an attack. When that happened, her throat closed up and she would get short of breath and begin to wheeze. She used an inhaler to get the condition under control. At her job she would get attacks "once in a while," whenever there was a lot of smoking, vacuuming, or cleaning being done near her. She claimed she told the company to have the offices cleaned when employees were not present. As of the date of her deposition in October 1996, her last attack had occurred in January 1995 when she had the flu or bronchitis.
In her argument on the summary judgment motion, plaintiff admitted that an employer can fire an employee for failing to appear for work. However, counsel maintained that "other circumstances" were present here. For example, because of the AT & T divestiture in 1984, the company could not produce attendance records from the pre-1984 period. Also, plaintiff calculated a total of 184 absences due to incidental illnesses, instead of 188.5. However, she agreed that her disabilities added up to 477 days. Of those, 194.5 days were attributable to disabilities that occurred prior to 1984 when no one knew "what happened back then" or what the policies were.
Plaintiff argued that her poor attendance record was simply a pretext the company used to terminate her. She noted that she was told to improve, did improve, and then thought everything was fine. The company granted her a disability leave and then held that leave against her. She argued she should not have been penalized for taking disability leaves to which she was entitled. She considered the fact that she was paid for her leaves-of-absence as evidence of her entitlement.
*669 Plaintiff also pointed out that none of her final warnings were ever really final because she was always allowed to improve, and that all of the periodic warnings she received were based on short periods of time, such as one year, rather than on her overall career record. According to plaintiff, in looking back at her entire career when firing her, the company tried to conceal the real reason for terminating her the injuries she sustained in the car accident in 1992.
Plaintiff also claimed that the company terminated her because it did not want to accommodate her disability by allowing her to work on restricted duty. When the judge pointed out that the company did in fact let her work half-days, plaintiff's counsel answered that those half-days were then counted against her attendance record.

III
The judge ruled that there were four elements to plaintiff's prima facie case of disability discrimination: (1) that she suffered from a recognized handicap; (2) that she was performing her job at a level that met her employer's expectations; (3) that she was terminated; and (4) that the company sought someone to perform the same work after she left.
The judge found sufficient evidence to conclude that plaintiff was handicapped within the meaning of the LAD. He pointed out that the New Jersey courts have found employees handicapped who suffered from such conditions as alcoholism, spinal and back ailments, obesity, and heart attacks.
On the second element, the judge held that plaintiff had to show that, despite her disability, she was able to perform the essential functions of her job and that she was otherwise qualified to fulfill her position. The judge had to first determine whether plaintiff was capable of performing the essential functions of her job with reasonable accommodations; if so, then he had to determine what reasonable accommodations by the employer would enable her to perform those functions.
After reviewing plaintiff's attendance record from 1989 to 1993, the judge concluded there was support for the position that plaintiff had been out of work unpredictably and for a variety of reasons. The judge concluded that no accommodation was required in this case because plaintiff was not otherwise qualified to do her work. That is, she could not be so qualified because she was not there. Applying the summary judgment standard, the judge held that the evidence was so "one-sided" that defendants must prevail as a matter of law. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995).
Although not necessary to his ruling, the judge also observed that the record did not show any discrimination on the employer's part, just a continuous concern for plaintiff's absenteeism. The record was replete with warnings given to plaintiff regarding her absenteeism, as early as 1985. The longest plaintiff ever went without an absence was five months and that trend did not last. Hence, there was no jury question presented as to whether she was performing her job at a level that met her employer's expectations.
Plaintiff conceded that all of her other asserted causes of action must be dismissed along with the LAD claim, except for her claim that AT & T violated her State constitutional rights. As to that claim, the court ruled that there was no constitutionally protected right to any one particular job and that the standards for assessing an employment discrimination claim under the State constitution were the same as those used for an LAD claim. Hence, plaintiff's constitutional claim was dismissed as well. Plaintiff now appeals, arguing only that the judge erred in dismissing her cause of action for disability discrimination under the LAD.

*670 IV
Plaintiff claims that the judge erred by granting summary judgment in favor of defendants and dismissing her claim for disability discrimination under the LAD. We disagree. Discrimination against an employee because of a handicap is unlawful "unless the nature and extent of the handicap reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1. "Handicapped" includes
suffering from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness, ... or from any mental, psychological or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable ... by accepted clinical or laboratory diagnostic techniques....

[N.J.S.A. 10:5-5(q).]
Termination of an employee for a condition covered by the broad language of N.J.S.A. 10:5-5(q), which condition does not prevent the employee from doing her job, is actionable under the LAD. Gimello v. Agency Rent-A-Car Sys., Inc., 250 N.J.Super. 338, 365, 594 A.2d 264 (App. Div.1991). However, nothing in the LAD is construed to prevent the termination of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment. N.J.S.A. 10:5-2.1.
In discriminatory discharge cases brought under the LAD based on an employee's handicapped status, the employee must carry the initial burden of establishing a prima facie case of discrimination. This prima facie case requires proof that the employee was handicapped, that she was performing at a level that met the employer's expectations, that the employee was fired, and that the employer then sought someone to perform the same work. Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 480-81, 593 A.2d 750 (1991); Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 596, 538 A.2d 794 (1988).
In the present case, the judge found that plaintiff was handicapped due to her asthma and the bodily injuries she sustained in her motor vehicle accident. On appeal, defendants do not challenge that finding. In view of the broad scope of the statutory definition contained in N.J.S.A. 10:5-5(q), and the fact that, unlike disabled plaintiffs under the ADA, the LAD plaintiff need not demonstrate there is a substantial impairment of a major life activity, DeJoy v. Comcast Cable Communications, Inc., 968 F.Supp. 963, 985 (D.N.J.1997), we leave the Law Division judge's ruling undisturbed in this regard.
Both sides concentrate only on whether plaintiff satisfied the second prong of the prima facie test that she was performing her job at a level which met her employer's expectations. Without dispute, plaintiff was a satisfactory worker in terms of her performance, when she worked. She always received satisfactory ratings on her annual performance reviews and even received some commendations regarding her job performance. The only unsatisfactory part of her performance was her inability to appear regularly for work as required. Plaintiff claims that her disabilities prevented her from satisfactory attendance and that she should have been accommodated for these disabilities. We conclude that plaintiff has misconstrued the accommodation requirement as it pertains to disabled or handicapped workers.
Regulations promulgated by the New Jersey Division on Civil Rights with respect to accommodating disabled workers are found at N.J.A.C. 13:13-2.5. Those regulations were patterned after those promulgated under the federal Rehabilitation Act of 1973. Hence, we consider it appropriate to consult case law interpreting the federal statute. Ensslin v. Township of North Bergen, 275 N.J.Super. 352, 364, 646 A.2d 452 (App.Div.1994), certif. *671 denied, 142 N.J. 446, 663 A.2d 1354 (1995). According to N.J.A.C. 13:13-2.5(b):
An employer must make a reasonable accommodation to the limitations of a handicapped employee or applicant, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. The determination as to whether an employer has failed to make reasonable accommodation will be made on a case-by-case basis.
Reasonable accommodation may include job restructuring, part-time or modified work schedules, N.J.A.C. 13:13-2.5(b)(1)(ii), as well as job reassignment and other similar actions. N.J.A.C. 13:13-2.5(b)(1)(iv). "An employer shall consider the possibility of reasonable accommodation before firing ... a handicapped person on the grounds that his or her handicap precludes job performance." N.J.A.C. 13:13-2.5(b)(2). In determining whether an accommodation would impose an undue hardship on the employer, factors to consider include the size of the business, the type of the employer's operations, the nature and cost of the accommodation, and "[t]he extent to which accommodation would involve waiver of an essential requirement of a job as opposed to a tangential or non-business necessity requirement." N.J.A.C. 13:13-2.5(b)(3)(i)-(iv).
An exception to accommodation exists where an employer reasonably determines that an employee, because of a handicap, cannot presently perform the job even with accommodation. N.J.A.C. 13:13-2.8(a). Such a decision, however, must be based on an objective standard supported by factual evidence rather than on the basis of general assumptions about particular handicaps. N.J.A.C. 13:13-2.8(a)(1). The burden of proof is on the employer to demonstrate that the exception relied upon is based on such an objective standard supported by factual evidence. N.J.A.C. 13:13-2.8(a)(3). However, no exception shall be based on a "refusal to select a handicapped individual because of an assumption not supported by factual documented proof that such individual will incur a high rate of absenteeism in the future." N.J.A.C. 13:13-2.8(a)(3)(iii).
These regulations have been interpreted to mean that the "essential requirements" of the job must first be identified in order to determine whether the accommodation sought would impose an undue hardship on the employer. Ensslin, 275 N.J.Super. at 365, 646 A.2d 452. In interpreting similar language in the federal statute, the United States Supreme Court has held that an employer cannot discriminate against an employee if she can perform the essential functions of the job in issue in spite of the handicap. See Southeastern Community College v. Davis, 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980, 988 (1979). If the employee cannot, then the court must consider whether reasonable accommodations would enable the person to perform those functions; however, an accommodation is not reasonable if it imposes undue financial and administrative burdens or requires fundamental changes in the nature of the employment. School Bd. of Nassau Cty., Florida v. Arline, 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307, 321 n. 17 (1987).
In our jurisdiction, only administrative agency decisions have considered whether an employee's absenteeism due to an underlying disability can be reasonably accommodated. One of those decisions, in favor of the employee, was affirmed on appeal by a panel of this court. In State Operated Sch. Dist. of Jersey City v. Howard, 95 N.J.A.R.2d 301, 1993 WL 794064 (Vol.7C) (Education) (App.Div.1995), the employee, a tenured teacher, was a rehabilitated alcoholic whose absenteeism was excessive during the years in which she was drinking. Once she acknowledged her need for help, she entered an in-patient treatment program for two months and achieved rehabilitation. When she sought another leave shortly after returning to work, it was granted. Not until the following *672 school year was she notified of tenure charges filed against her for prior absenteeism. We acknowledged that chronic excessive absenteeism may well constitute incapacity warranting removal of a tenured teacher. That is, there can be "little question that a tenured teacher whose alcoholic problems continue to result in chronic excessive absenteeism and prevent her from regular fulfillment of her teaching duties suffers from an incapacity that may justify her removal." Ibid.
However, the questions before this court were whether there was a reasonable accommodation that could be made to the employee's alcoholism and whether her rehabilitation precluded her removal under the LAD. We deferred to the State Board of Education's conclusion that the mere affording of an opportunity for rehabilitation did not constitute the required reasonable accommodation "since the main point of affording that opportunity is to enable the employee to retain her position if she is in fact rehabilitated." We also agreed with the State Board that withholding continued employment on the theory that a rehabilitated alcoholic will predictably or necessarily relapse was violative of the very purpose of the LAD's protection of handicapped persons. Id. at 302, 1993 WL 794064.
In our view, the Howard case is quite different from the situation before us. Unlike the teacher in Howard, plaintiff did not suffer from a particular, discrete disability for which she sought and obtained treatment, rehabilitation and recovered. Moreover, unlike the teacher in Howard, plaintiff never achieved a satisfactory level of attendance and never demonstrated any present ability to meet the attendance requirements of her job. On the contrary, plaintiff had been warned about her sporadic, unpredictable, chronic, and excessive absenteeism for at least eight years prior to her termination. Her absences were due to a host of illnesses, not simply her claimed disabilities of asthma and the car-accident-related injuries. She never required rehabilitation for any particular illness; rather, as each new illness emerged, she sought acute medical treatment. Even when she returned to the job on October 25, 1993, following her most recent disability leave, she worked only restricted hours, an indication that she was not presently able to meet the requirements of her job.
Cases interpreting the federal statutes, both the Rehabilitation Act and the ADA, agree that chronic and excessive absenteeism need not be accommodated. The same holds true for cases interpreting such anti-discrimination statutes under state law. For example, in Jackson v. Veterans Admin., 22 F.3d 277 (11th Cir.), cert. denied, 513 U.S. 1052, 115 S.Ct. 657, 130 L.Ed.2d 560 (1994), the court held that presence on a routine basis can be an essential element of one's job and that if an employee is absent on a sporadic and unpredictable basis, she cannot fulfill this function and is not "otherwise qualified" for the position as required by the Rehabilitation Act. Id. at 278-79. The court also recognized that there is no way to reasonably accommodate the unpredictable aspect of an employee's sporadic and unscheduled absences. This is true even if the employee is using time allotted to her, and even if the absences are disability related. Id. at 279; see Lindgren v. Harmon Glass Co., 489 N.W.2d 804, 809 (Minn.Ct.App.1992) (fact that employee's absences are caused by disability does not automatically render discriminatory the employer's articulated reason for termination; problems caused by disability may constitute legitimate nondiscriminatory basis for termination).
Similarly, in Santiago v. Temple Univ., 739 F.Supp. 974 (E.D.Pa.1990), aff'd, 928 F.2d 396 (3d Cir.1991), the Pennsylvania federal court held: "An employee of any status ... cannot be qualified for his position if he is unable to attend the workplace to perform the required duties, because attendance is necessarily the fundamental prerequisite to job qualification." Id. at 979. An employee who demonstrates an inability to attend work with any degree of *673 predictability and reliability cannot be reasonably accommodated. Ibid.
The authorities recognize that reasonably regular, reliable, and predictable attendance is a necessary element of most jobs. An employee who does not come to work cannot perform any of her job functions, essential or otherwise. Tyndall v. National Educ. Ctrs., Inc. of Cal., 31 F.3d 209, 213 (4th Cir.1994); Magel v. Federal Reserve Bank of Phila., 776 F.Supp. 200, 204 (E.D.Pa.1991), aff'd, 5 F.3d 1490 (3d Cir.1993); Walders v. Garrett, 765 F.Supp. 303, 309-10 (E.D.Va. 1991), aff'd, 956 F.2d 1163 (4th Cir.1992); Wimbley v. Bolger, 642 F.Supp. 481, 485 (W.D.Tenn.1986), aff'd, 831 F.2d 298 (6th Cir.1987). Hence, even an employee whose job performance is more than adequate when she is working will not be considered qualified for the job unless the employee is also willing and able to come to work on a regular basis. Tyndall, 31 F.3d at 213; see Hayes v. Cleveland Pneumatic Co., 92 Ohio App.3d 36, 634 N.E.2d 228, 232 (1993) (frequency of absences may demonstrate that plaintiff is incapable of doing the job, despite the quality of the performance), appeal dismissed, 69 Ohio St.3d 1415, 630 N.E.2d 376 (1994). The necessary level of attendance is a question of degree depending on the circumstances of each position. Walders v. Garrett, 765 F.Supp. at 310. For example, in Giaquinto v. New York Tel. Co., 135 A.D.2d 928, 522 N.Y.S.2d 329 (1987), appeal denied, 73 N.Y.2d 701, 535 N.Y.S.2d 595, 532 N.E.2d 101 (1988), the New York appellate court held that good employee attendance was necessary for the defendant telephone company to provide its communication services twenty-four hours a day, 365 days a year. Id. 522 N.Y.S.2d at 330-31.
Some courts have held that leaves of absence and allowance of time-off for medical care or treatment may constitute reasonable accommodations for disability-related absences. See e.g., Criado v. IBM Corp., 145 F.3d 437, 443 (1st Cir.1998); Rascon v. U.S. West Communications, Inc., 143 F.3d 1324, 1333-34 (10th Cir. 1998); Kimbro v. Atlantic Richfield Co., 889 F.2d 869, 878 (9th Cir.1989), cert. denied, 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990); Rodgers v. Lehman, 869 F.2d 253, 259-60 (4th Cir.1989). Nevertheless, an indefinite unpaid leave is not a reasonable accommodation, especially where the employee fails to present evidence of the expected duration of her impairment. Rascon, 143 F.3d at 1334 (citing Myers v. Hose, 50 F.3d 278, 283 (4th Cir.1995) (reasonable accommodation does not require employer to wait indefinitely for plaintiff's medical condition to be corrected)). Whether a leave request is reasonable will turn on the facts of each particular case. Criado, 145 F.3d at 443.
Thus, in Criado, the company provided all employees with fifty-two weeks of paid disability. The plaintiff in that case suffered from an anxiety disorder and depression. Her doctor testified that if she were given a significant leave she would be able to adjust to her situation and return to her previous level of functioning. Id. at 443. Under those circumstances, the First Circuit concluded that the plaintiff was not asking for more leave than would be granted to non-disabled employees who happened to become sick, and that the company's assertion that plaintiff's termination was based on her absenteeism rather than on her disability did not justify its action "where the absence was the requested accommodation" and where the requested leave was not expected to be "prolonged or perpetual." Id. at 444-45.
In contrast, in Walders, the employee sought accommodation for her disability-related absences by requesting removal of the employer's leave restrictions, utilization of donated leave, the grant of leave without pay, the taking of unscheduled leave when needed, and the use of company time before it was earned. The Virginia federal court held that these accommodations were not reasonable because the plaintiff was essentially *674 seeking "to be allowed to work only when her illness permits." Walders, 765 F.Supp. at 313. An accommodation cannot be considered reasonable if it demands "irregularity." Id. at 314; see Magel, 776 F.Supp. at 204 (employer is not required to create a job for an employee which allows long periods of regular absences).
Moreover, once an employer presents credible evidence that it provided a reasonable accommodation or that it was not able to accommodate, the employee has the burden of going forward with rebuttal evidence to show what accommodations were possible. Id. at 205. In Lawrence v. National Westminster Bank New Jersey, 98 F.3d 61 (3d Cir.1996), the Third Circuit held that a disabled employee's claim under both the ADA and the LAD failed where the employee did not allege what actual accommodations were lacking. Id. at 69, 70 n. 13.
Applying these principles to the present case, we agree with Judge Locascio that plaintiff did not demonstrate she was capable of performing the essential requirements of her job to the satisfaction of her employer in spite of her alleged handicap. Plaintiff never disputed that her job required her to be present at the office, that she was absent from the office more than 600 days in a twenty-two-year period, and that she was warned on numerous occasions in the last eight years of her employment that her attendance was unsatisfactory and would lead to her dismissal if it did not improve.
Plaintiff failed to demonstrate that, with a reasonable accommodation, she would have been able to perform her job functions satisfactorily. Although plaintiff claims that her firing was due to the company's unwillingness to accommodate her disabilities, the only accommodations she sought were part-time hours and a totally smoke-free environment. Even putting aside the questions whether AT & T had an obligation to let plaintiff work part-time or whether the company failed to insure that the environment was totally smoke-free, the fact remains that neither of those accommodations would have solved the underlying problem that led to plaintiff's dismissal her inability to show up for work on a consistent and reliable basis over a prolonged period of time. For example, plaintiff was allowed to work on a part-time basis when she returned to work from her disability leave in April 1993 and she lasted only several weeks before having to take another leave.
This was not a situation where plaintiff was fired because her employer perceived individuals with asthmatic conditions are likely to be absent from work a good deal. Nor was this a situation where she was fired following a leave of absence during which she sought treatment for her asthma. Rather, the record shows that she was given numerous disability leaves, some for lengthy periods of time, and that she was still unable to achieve satisfactory attendance following her returns to work.
While it is true that AT & T, like IBM in the Criado case, granted all employees short-term disability leave, this did not mean that employees were automatically protected from dismissal as long as they were out on such leave. As defense counsel persuasively argued in the Law Division, the fact that employees were paid while they were out of work did not mean they were "entitled" to the leave in the sense that their absences from work would be excused or overlooked. Plaintiff herself is not claiming such protection. Rather, she is assuming that because her medical leaves were related to an articulated "handicap" under the LAD, she was eligible for protected status. While plaintiff is correct that the company could not treat her medical leave differently from other employees' leaves because her leave was asthma-related, this does not mean that she was entitled to greater job protection. There is no allegation here that AT & T allowed employees who were sick, but not otherwise handicapped or disabled, to *675 take as much medical leave as they wanted.
Plaintiff also contends that the company treated her unfairly by looking at her career attendance record when firing her and that this showed absenteeism was simply a pretext for the company's desire to discriminate against handicapped individuals. We disagree. First, even if the company had confined its review to plaintiff's last eight years on the job, when she had received numerous and strenuous warnings regarding her attendance, there would have been more than sufficient reason for terminating her. Second, by looking at her entire record, the company was insuring that it was not unfairly penalizing her for a recent bad spell of attendance.
Finally, there is not one shred of evidence that defendants' conduct was motivated by discriminatory animus. To defeat summary judgment in a discriminatory discharge case, the employee must submit evidence that either casts sufficient doubt upon the employer's proffered legitimate reason so that a factfinder could reasonably conclude it was fabricated, or that allows the factfinder to infer that discrimination was more likely than not the motivating or determinative cause of the termination decision. Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir.1994). All that is needed is some evidence from which a factfinder could infer that the employer's proffered reason was either a post hoc fabrication or otherwise did not actually motivate the decision. Id. at 764; Greenberg v. Camden Cty. Vocational & Technical Sch., 310 N.J.Super. 189, 200, 708 A.2d 460 (App.Div.1998). A plaintiff must demonstrate weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason such that a rational factfinder could find the reason unworthy of credence. Fuentes, 32 F.3d at 765.
Plaintiff made no such showing here. There is nothing in the record from which a reasonable factfinder could conclude that AT & T fabricated plaintiff's excessive absenteeism as the excuse for firing her to hide the fact that it did not want to employ individuals with asthma or accident-related injuries. We conclude the trial judge correctly granted summary judgment in defendants' favor.
Affirmed.