786 A.2d 143 (2001)
345 N.J. Super. 595
Arthur MULLER, Plaintiff-Appellant,
v.
EXXON RESEARCH AND ENGINEERING COMPANY, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 2001.
Decided December 17, 2001.
*144 Neil H. Deutsch, Hackensack, argued the cause for appellant (Deutsch, Resnick, Green & Grabell, attorneys; Mr. Deutsch and Jonathan Nirenberg, on the brief).
Lawrence R. Maddock argued the cause for respondent (Waters, McPherson, McNeill, attorneys; Mr. Maddock, on the brief).
Before Judges BAIME, NEWMAN and AXELRAD.
The opinion of the court was delivered by NEWMAN, J.A.D.
Plaintiff, Arthur Muller, appeals from an order granting summary judgment and dismissing plaintiff's complaint alleging a violation of this State's Law Against Discrimination (LAD), N.J.S.A. 10:5-1 et seq. We affirm.
Plaintiff, who is now fifty-six years old, worked for defendant Exxon Research and Engineering Company (Exxon) from 1978 through 1997. Plaintiff started as a construction mechanic and was promoted to a senior construction mechanic during his second year of employment. In this capacity, plaintiff renovated and built laboratory facilities, performed carpentry work involving sheet metal and plastic, interpreted blueprints, ran safety courses on machinery, and instructed junior mechanics on how to use machinery and lay out jobs. Plaintiff constructed special shipping crates, cabinets, pieces of furniture, "hot boxes," and custom pallets ranging from one to twelve feet long.
Construction of the laboratory facilities required plaintiff to install large vent hoods and lab benches weighing approximately one hundred pounds. The "hot boxes" and unistrut racks (bolting or clamping devices) with which plaintiff worked could weigh in excess of one thousand pounds. Plaintiff also worked with gas cylinders weighing approximately two hundred pounds and plastic Lucite boxes weighing roughly seventy pounds. Plaintiff explained that the laboratory construction was a constantly recurring process, because when projects were completed the labs would be disassembled and re-built.
Exxon required mechanics to "have the physical capability and manual dexterity to perform advanced mechanical work." Plaintiff performed the full scope of his duties as a senior construction mechanic up until October 1986, when plaintiff suffered a severe injury to his left elbow, which required four surgeries. Prior to this injury, plaintiff had worked without restriction on ladders and scaffolding at heights up to thirty feet. He would regularly lift and carry objects ranging from twenty-five to over fifty pounds. Plaintiff acknowledged that lifting and carrying objects weighing twenty-five to fifty pounds and working at heights were at times physical requirements of his job as a construction mechanic.
Plaintiff was placed on light duty after the October 1986 injury. He could no longer work at heights and could not lift objects over twenty-five pounds. Plaintiff also experienced pain on the entire left *145 side of his body as a result of his elbow injury and subsequent operations.
Following surgery in 1990, plaintiff worked two or three hours a day for a couple of days a week and gradually increased his schedule to working four hours per day, five days a week, a schedule on which plaintiff remained for "[q]uite a few years." Plaintiff attempted to increase his hours first to five per day and then to six per day. However, as plaintiff explained:
It was too much to [work] five days a week, okay? The four hours a day was working out fine, but it was also interfering with some of the work that I had to do in work, and I made the suggestion to Dr. Marcus that it might be more beneficial to the company and to me to work, you know, eight-hour days, and rest on the middle of the week, rather than to continue on four-hour days, because I could do more than four hours a day, but I couldn't do five, six-hour days.
Around 1993, plaintiff began working eight-hour days four times per week, Monday, Tuesday, Thursday, Friday and having Wednesday off. While working this schedule, Exxon permitted plaintiff to leave work early if he was in pain or became fatigued, a privilege of which plaintiff availed himself about five or six days per month. Plaintiff was also allowed to take rest breaks as needed and was given days off to visit his doctors.
Back in March 1991, plaintiff had been given a functional capacity test, which revealed that he could lift sixty pounds from floor to knuckle, forty pounds from knuckle to shoulder, and thirty-five pounds from shoulder to overhead, although plaintiff disagreed with this last finding. Plaintiff underwent a subsequent functional capacity evaluation on February 19, 1997, at which time plaintiff could lift a maximum of only twenty pounds from floor to knuckle, ten pounds from knuckle to shoulder, and plaintiff was unable to lift any weight overhead. Plaintiff admitted that he "cannot put [his] left arm above [his] shoulder."
The functional capacity test further revealed that plaintiff could carry a maximum weight of only twenty pounds and could push or pull a maximum weight of fifty pounds. These results fell far short of the "job demand" requirements, which provided that a construction mechanic should be able to lift over one hundred pounds floor to knuckle, fifty pounds knuckle to shoulder, fifty pounds overhead, and carry over one hundred pounds.
The 1997, evaluation concluded that plaintiff was physically able to perform light labor, rather than the medium labor required of a construction mechanic. Plaintiff conceded that "to a certain capacity" he was not able to perform the full range of functions he had done prior to his October 1986 injury. He agreed that there were occasions when he was performing light duty work, he would still have to go home early due to exertion. Plaintiff pointed out that he always accomplished his tasks, and that there was never a time when he could not obtain assistance to lift a heavy object. Plaintiff stated that he was required to lift heavy objects three or four times per week.
Plaintiff received full pay after his 1986 injury, despite his truncated work schedules. The situation changed when Exxon placed plaintiff on Disability Absence Certification effective March 31, 1997, which required that plaintiff work five days a week in order to receive full pay and obligated plaintiff to bring a note from his doctor upon returning from each illness absence. Apparently, plaintiff remained on his four-day work schedule, and some of his paychecks therefore reflected less than forty hours' pay.
*146 On April 7, 1997, plaintiff met with Exxon representatives to voice his concern that he was being forced into early retirement by Exxon's new disability compliance policies. Plaintiff was told "that Exxon does not have any part time jobs and that the expectation following a disability is that the individual will return to work full time at essentially full capacity. Some restrictions which do not prohibit the individual from performing their [sic ] work may remain permanently."
From 1990 through 1997, plaintiff was out of work approximately 700 days and was absent over twenty-five percent of the time during six out of these seven years. Plaintiff remained on light duty until June 12, 1997, when he was involved in an automobile accident, in which he suffered a concussion, broken nose, whiplash, loss of all but four of his upper teeth, as well as a fractured palate, jaw, and left wrist or hand. Plaintiff underwent six or seven operations as a result of this accident.
At a subsequent meeting with an Exxon representative on January 9, 1998, plaintiff was informed that Exxon "did not have any positions available which [he] might reasonably be expected to perform based on the restrictions listed by HSD (Human Services)." This decision was based upon plaintiff's functional capacity evaluation and information provided by plaintiff's doctors, which indicated that plaintiff would not be able to return to work full-time without restrictions in the foreseeable future.
After the 1997 automobile accident, plaintiff received his full salary of approximately $44,000 as a short-term disability benefit for one year. Exxon placed plaintiff on disability retirement effective June 13, 1998. As a retirant, plaintiff receives fifty percent of his yearly salary, life insurance, and medical and dental insurance for life.
Plaintiff testified at deposition that there were three or four construction mechanics at Exxon's Clinton facility where he worked, and plaintiff agreed that Exxon did not seek to fill his former position after he was placed on medical disability. Since being placed on disability retirement, plaintiff has not attempted to obtain part-time or full-time employment. Plaintiff explained that his doctors instructed him that he "would be better off not working" because of his physical condition.
On March 18, 1999, plaintiff completed and signed a questionnaire to obtain Social Security disability benefits, in which he stated: "I wake up on & off during the night because of pain. I'm in pain 24 hours a day. Pain is my life." Plaintiff continued: "I can't lift over 20 lbs., walk or stand a long time-1/2 to 1 hour standing on a good day." In response to a section pertaining to household maintenance, plaintiff wrote: "I can't do any major repairs. I hire someone or my 2 sons do it."
In denying plaintiff's motion for summary judgment and granting Exxon's cross-motion for summary judgment, Judge Stephen F. Smith, Jr. stressed that since plaintiff's 1986 elbow injury plaintiff has been unable to perform the medium labor required of a senior construction mechanic. The court continued:
The plaintiff is not a qualified individual for purposes of the LAD if he is unable to perform the essential job functions of his job with or without reasonable accommodation. And looking to the particular facts in this case, it seems that the plaintiff was disabled to the extent that he was not able to carry on the medium duties, the essential job functions, as defined essential to the job function without accommodation. And further, that he was unable to fulfill the job functions even with an accommodation *147 which would, in essence, allow him to be a permanent part-time worker.
....
Here, the plaintiff has failed to set forth any accommodations that would be made that would allow him to perform the essential job functions....
So here, the defendants for a period of time essentially created a new position for the plaintiff by allowing him to perform work which was light duty and significantly restricting his hours.
And under the definition, he is not an otherwise qualified individual to perform the job functions with or without reasonable accommodations.
....
So the undisputed medical evidence establishes that the plaintiff no longer has the functional capacity to perform the medium labor, the job as a senior construction mechanic....
On appeal, plaintiff disputes the trial court's finding that plaintiff's physical inability to work full-time in a capacity in which he was required to lift and carry objects exceeding certain weights made plaintiff unable to perform the essential function of his job as a senior construction mechanic. Plaintiff also argues that the trial court erroneously concluded that Exxon "exceeded its legal obligations because it had, for the ten (10) years prior to his medical leave in 1997, created a `light duty' job for him with those non-legally required accommodations."
Plaintiff, however, does not dispute that he is physically unable to perform the full-time, medium labor-intensive work required of a senior construction mechanic. Plaintiff testified that prior to his 1986 elbow injury he performed several physical functions that he has since been unable to perform. Plaintiff worked exclusively on light duty assignments for over ten years following his 1986 injury. The medium labor-intensive position of senior construction mechanic requires one to work at heights, perform overhead work, lift objects overhead, and lift and carry heavy objects, all on a full-time basis. Plaintiff concedes that he is physically unable to perform any of these tasks.
Plaintiff further argues that "the LAD requires employers to permit handicapped employees to work a part-time or modified job schedule unless it can establish that doing so would impose an undue hardship upon its business." Plaintiff asserts that defendant's new policy of requiring disabled employees returning from disability leave to return to full-time employment at essentially full capacity within a reasonable time violates the LAD.
The LAD "must be applied sensibly with due consideration to the interests of the employer, employee, and the public." Jansen v. Food Circus Supermarkets, Inc., 110 N.J. 363, 374, 541 A.2d 682 (1988). In this regard, the LAD should not be construed
to prohibit the establishment and maintenance of bona fide occupational qualifications..., nor to prevent the termination... of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards[.] ...

[N.J.S.A. 10:5-2.1.]
A prima facie case of discriminatory discharge for failure to accommodate an employee's handicapped status under the LAD requires the employee to present proof that (1) the employee was handicapped, (2) he was otherwise qualified to perform the essential functions of the job, *148 with or without the accommodation by the employer, and was performing at a level that met the employer's expectations, (3) he was fired, and (4) the employer then sought someone to perform the same work. Clowes v. Terminix Int'l, Inc., 109 N.J. 575, 597, 538 A.2d 794 (1988); Svarnas v. AT & T Comms., 326 N.J.Super. 59, 73, 740 A.2d 662 (App.Div.1999) (citing Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 480-81, 593 A.2d 750, (1991)).
Svarnas is most instructive because of the similar fact pattern to this case. There, defendant, AT & T's, records revealed that between 1971 and 1993, plaintiff had 121 incidents of absences, for a total of 188.5 days. Id. at 64, 740 A.2d 662. Plaintiff also had eleven disabilities (absences of more than eight consecutive days) totaling 477.5 days of absence. Ibid. AT & T permitted the plaintiff to work half days (four hours per day) following her return from disability leave. Id. at 66-67, 740 A.2d 662. The plaintiff's supervisors had discussions with her concerning her unsatisfactory attendance on nine separate occasions over a five year time period. Id. at 64, 740 A.2d 662. AT & T's employment policy required satisfactory attendance. Id. at 65, 740 A.2d 662.
The plaintiff argued that her poor attendance record was simply a pretext AT & T used to terminate her, and that the company terminated her because it did not want to accommodate her disability by allowing her to work on restricted duty. Id. at 70-71, 740 A.2d 662. The trial court found that although plaintiff satisfied the first element of her prima facie case of disability discrimination, she failed to satisfy the second prong, namely, performing her job at a level that met her employer's expectations. Id. at 71-72, 740 A.2d 662. Reviewing the plaintiff's attendance record from 1989 to 1993, the trial court concluded there was support for the position that the plaintiff had been out of work unpredictably and for a variety of reasons. Ibid. The court held that no accommodation was required because the plaintiff was not otherwise qualified to do her work: "[t]hat is, she could not be so qualified because she was not there." Id. at 72, 740 A.2d 662.
In affirming this decision, we explained that "nothing in the LAD is construed to prevent the termination of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment." Id. at 73, 740 A.2d 662 (citing N.J.S.A. 10:5-2.1). We reasoned that although the plaintiff consistently scored satisfactory or better on her annual performance reviews, her excessive absenteeism and inability to appear regularly for work as required rendered her performance unsatisfactory. Id. at 74, 740 A.2d 662. The plaintiff never achieved a satisfactory level of attendance and never demonstrated any present ability to meet the attendance requirements of her job. Id. at 77, 740 A.2d 662. The plaintiff had been warned about her sporadic, unpredictable, chronic, and excessive absenteeism for at least eight years prior to her termination. Ibid. Moreover, we stressed that the plaintiff's restricted four-hour days upon returning to her job following her most recent disability leave presented "an indication that she was not presently able to meet the requirements of her job." Ibid.
We explained that cases interpreting the federal Americans with Disabilities Act (ADA) as well as state anti-discrimination statutes "agree that chronic and excessive absenteeism need not be accommodated." Ibid. We agreed with the trial court that the "plaintiff did not demonstrate she was capable of performing the essential requirements of her job to the satisfaction of *149 her employer in spite of her alleged handicap." Id. at 80, 740 A.2d 662.
Finally, we noted that "there is not one shred of evidence that defendants' conduct was motivated by discriminatory animus." Id. at 82, 740 A.2d 662. We further elaborated that "[t]here is nothing in the record from which a reasonable factfinder could conclude that AT & T fabricated plaintiff's excessive absenteeism as the excuse for firing her to hide the fact that it did not want to employ individuals with asthma or accident-related injuries." Ibid. In affirming the grant of summary judgment to the defendant employer, we concluded that the employer was not "required to accommodate through toleration an employee's chronic, sporadic, and excessive absenteeism, if the absences are related to a disability or handicap recognized under the LAD." Id. at 63, 740 A.2d 662.
So too here. Plaintiff was absent from work approximately 700 days over the seven year period immediately preceding his placement on disability retirement. Plaintiff admittedly cannot physically work a full-time, forty-hour work schedule, which has resulted in his excessive absenteeism over the years. Exxon has tolerated this absenteeism and has accommodated plaintiff's disabilities by placing him on exclusively light duty assignments during this extensive time period. However, the law does not require that Exxon indulge plaintiff indefinitely.
Plaintiff asserts that he is in constant pain as a result of his injuries and that his abilities are greatly restricted. Plaintiff's doctors recommend that he not work. Plaintiff concedes that he cannot physically perform the rigors required of the medium labor-intensive position of senior construction mechanic. Moreover, Exxon has not hired a replacement to perform plaintiff's duties. See Melick v. Tp. of Oxford, 294 N.J.Super. 386, 395, 683 A.2d 584 (App.Div.1996) (explaining that fourth prong of prima facie case of employment discrimination requires a showing that the employer sought other applicants for the position). Under this scenario, we will not disturb the trial court's determination that plaintiff was not an otherwise qualified individual, as he simply lacked the physical ability to perform his job. See Allen v. Georgia Power Co., 980 F.Supp. 470, 476 (N.D.Ga.1997) (holding that certain physical movements that an electrician could not perform because of a back injury were "essential functions of the position of electrician" even though the electrician had continued in his job for 30 months after the injury in a "light duty" capacity in which he performed none of those movements); Hendrickson v. Magney Const. Co., 402 N.W.2d 194, 197 (Minn.App.1987) (holding that plaintiff failed to show that he possessed the qualifications necessary for the general superintendent position because his injury precluded him from performing the tasks required by that job).
Under the LAD, "excessive absenteeism need not be accommodated even if it is caused by a disability otherwise protected by the Act." Malone v. Aramark Servs., Inc., 334 N.J.Super. 669, 675, 760 A.2d 833 (Law Div.2000) (citing Svarnas, supra, 326 N.J.Super. 59, 740 A.2d 662 (App.Div.1999)); see Hayes v. Cleveland Pneumatic Co., 92 Ohio App.3d 36, 43, 634 N.E.2d 228, 232 (1993) (frequency of absences may demonstrate that plaintiff is incapable of doing the job, despite the quality of the performance), appeal dismissed, 69 Ohio St.3d 1415, 630 N.E.2d 376 (1994). Moreover, "[a]n employer is not required to comply with every request of a disabled employee in order to avoid a jury trial in a LAD case." Jones v. Aluminum Shapes, Inc., 339 N.J.Super. 412, 428, 772 A.2d 34 (App.Div.2001).
*150 The LAD simply does not require that Exxon continue to accommodate plaintiff with light-duty assignments and an indefinite part-time work schedule, despite the fact that Exxon has endeavored to accommodate plaintiff's disabilities with part-time scheduling and light-duty assignments for a prolonged ten-year period. An employer that "bends over backwards to accommodate a disabled worker ... must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation." Vande Zande v. Wisconsin Dep't of Admin., 44 F.3d 538, 545 (7th Cir.1995); see also White v. York Int'l Corp., 45 F.3d 357, 362 (10th Cir.1995) ("[T]he ADA does not require an employer to promote a disabled employee as an accommodation, nor must an employer reassign the employee to an occupied position, nor must the employer create a new position to accommodate the disabled worker."); Whitbeck v. Vital Signs, Inc., 934 F.Supp. 9, 16 (D.D.C.1996), rev'd on other grounds, 116 F.3d 588 (D.C.Cir.1997) ("This type of accommodation by an employer, providing an entirely new part-time position for a disabled employee, courts have found is not required by the ADA."); Howell v. Michelin Tire Corp., 860 F.Supp. 1488, 1492 (M.D.Ala.1994) (explaining that a "[r]easonable accommodation... does not require that an employer create a light-duty position or a new permanent position"); Bellus v. State, 843 P.2d 119, 122 (Colo.App.1992) (explaining that "[n]either a fundamental alteration in the nature of a job nor the elimination of an essential job function is a reasonable accommodation").
Similarly, in Terrell v. USAir, 132 F.3d 621 (11th Cir.1998), the Eleventh Circuit ruled that the plaintiff's request for part-time employment was unreasonable in light of the fact that the defendant employer had no part-time positions. Id. at 626. The Court emphasized that USAir's effort to accommodate the plaintiff's disability by reducing her hours on four different occasions in 1991 and 1992 "does not, by itself, prove the reasonableness of Plaintiff's requested accommodation." Id. at 626, n. 6. The Court continued:
Although part-time work, as the statute and regulations recognize, may be a reasonable accommodation in some circumstances (particularly where the employer has part-time jobs readily available), we hold that USAir was not required to create a part-time position for Plaintiff where all part-time positions had already been eliminated from the company.

[Ibid.]
Plaintiff cites Skerski v. Time Warner Cable Co., A Div. of Time Warner Ent. Co., 257 F.3d 273 (3d Cir.2001), where the Third Circuit recently reversed the District Court's grant of summary judgment to the defendant employer in a case involving an employee working as a cable installer technician who experienced dizziness, nausea, and irregular heartbeats while working at heights. Id. at 275. In Skerski, the plaintiff's doctor recommended that he cease climbing ladders and poles and stop working at heights. Ibid. Accordingly, the plaintiff's employer modified his work schedule by limiting his assignments to underground work, which the plaintiff successfully performed for over three years. Ibid.
The Third Circuit ruled that the plaintiff's "ability to perform as an installer technician for more than three years without climbing might lead a reasonable juror to infer that Skerski's inability to climb had no adverse consequences for his employer, a factor that is relevant to determining what is an essential function." Id. at 283.
*151 Skerski is distinguishable. Skerski was able to work full-time, with no restriction other than height, rather than the modified part-time, light-duty schedule on which plaintiff worked. Thus, while Skerski was able to perform all the physical rigors required of an installer technician, on a full-time basis provided that he work at ground level, such was not the case with plaintiff, who, regardless of the height level at which he worked, could not physically perform on a full-time basis the tasks associated with the position of senior construction mechanic.
An employer is "not required to transform its temporary light duty jobs into permanent jobs to accommodate [an employee's] disability." Mengine v. Runyon, 114 F.3d 415, 418 (3d Cir.1997). Exxon was under no duty to create a permanent part-time, light-duty position for plaintiff.
In sum, the LAD does not require an employer to create a permanent part-time position for a disabled employee if no suitable full-time position exists. Nor does the LAD require an employer to create a permanent light-duty position to replace a medium-duty one. Rather, an employer must simply make all reasonable accommodations to an employee returning from disability leave and allow the employee a reasonable time to recover from his injuries. Exxon more than satisfied its obligation under the LAD.
Affirmed.