**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0380-19

OWEN R. MCFARLANE, M.D.,

    Plaintiff-Appellant,

v.

SOUTHERN JERSEY FAMILY
MEDICAL CENTERS, INC.,
LINDA Y. FLAKE,
ATLANTICARE PHYSICIAN
GROUP, P.A., BLAIR BERGEN,
M.D., ATLANTICARE REGIONAL
MEDICAL CENTER, and THE
BOARD OF GOVERNORS OF
ATLANTICARE REGIONAL
MEDICAL CENTER,

    Defendants-Respondents.

_____

Argued June 9, 2021 – Decided August 30, 2021

Before Judges Ostrer, Accurso, and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2893-18.

Christina Vassiliou Harvey argued the cause for appellant (Lomurro, Munson, Comer, Brown &

Schottland, LLC, attorneys; Michael D. Schottland and Christina Vassiliou Harvey, of counsel and on the briefs; Angel Falcón, on the brief).

Emily J. Daher argued the cause for respondents Southern Jersey Family Medical Centers, Inc., and Linda Y. Flake (Ballard Spahr, LLP, attorneys; Louis L. Chodoff and Emily J. Daher, of counsel and on the brief).

Eric M. Wood argued the cause for respondents Atlanticare Regional Medical Center, Atlanticare Physician Group, and Blair Bergen, M.D. (Eric M. Wood, of counsel and on the brief; Ciera A. Logan, on the brief).

PER CURIAM

Plaintiff Owen R. McFarlane, M.D. appeals from two orders dated August 26, 2019, one of which granted a motion to dismiss filed by defendants Southern Jersey Family Medical Center (SJFMC) and its President and Chief Executive Officer (CEO), Linda Y. Flake, and the other of which awarded summary judgment to defendants AtlantiCare Regional Medical Center (ARMC), AtlantiCare Physician Group (APG) and Dr. Blair Bergen. We affirm.

I.

This litigation stems from the fact that on August 6, 2015, plaintiff, a licensed physician, and SJFMC entered into an "Agreement to Provide Medical Services" (agreement), which was signed by plaintiff and Flake, as President

2

and CEO of SJFMC. The agreement was to commence on August 18, 2015,[1] and continue in force for a period of three years. Importantly, under the agreement's terms, SJFMC retained the right to terminate the agreement for various reasons, including if:

> (a) Physician ceases to maintain good standing with the medical licensing authority and/or is no longer authorized to practice medicine in the State of New Jersey;
>
> (b) Physician ceases to maintain good standing and/or is suspended or terminated from participation in the New Jersey Medicaid program or the Medicare Program, or to participate as a medical provider under the Blue Cross, Blue Shield, or any other third-party medical reimbursement program;
>
> . . . .
>
> (k) [SJFMC] determines in good faith Physician is not providing adequate patient care or that the safety of patients is jeopardized by his/her continued employment.

Also, under the agreement, plaintiff had to perform certain duties, such as "maintain privileges at [ARMC] and provide in-hospital care for [SJFMC's

---

[1] The agreement states in section 1.1 that plaintiff's services would commence on October 19, 2015, but in section 3.1 it states the term of the agreement "shall commence as of August 18, 2015." The starting date of the agreement does not present a question of material fact, however, because it is not in dispute and not relevant to any issue on appeal.

admitted] patients . . . within the accepted standards of Obstetrics and Gynecology." Further, plaintiff agreed "to maintain the generally accepted community standards of professional care of all patients served by him." Consistent with the terms of the agreement, plaintiff applied for privileges at ARMC in August 2015 and received notice in October 2015 that he was approved for appointment to ARMC's medical staff.

Between February 2017 and June 2017, plaintiff had three "adverse medical events" at ARMC as follows:

Case One - On February 5, 2017, following a laparoscopically-assisted vaginal hysterectomy, plaintiff inadvertently packed the patient's rectum instead of her vagina. The next day, he examined the patient, noticed the vaginal packing was not present, and was unsure of its location. He ordered an abdominal x-ray, which revealed the gauze was coiled over the patient's pelvis. The patient was placed under anesthesia, and the packing was removed from her rectum. The next day plaintiff reported the incident to Dr. Bergen, who was ARMC's Chair of the Department of Obstetrics and Gynecology. The patient remained hospitalized until February 10, 2017.

Case Two - On May 12, 2017, plaintiff performed a dilation and curettage hysterectomy and a uterine polyp removal on a patient and released her that day.

4

The patient went to the emergency room the following day, complaining of abdominal pain. Examination of the patient revealed a uterine perforation and a small bowel perforation, both of which plaintiff repaired. The patient experienced post-operative abscesses and required a three-week hospitalization.

Case Three - On June 2, 2017, plaintiff performed an abdominal hysterectomy on a patient who later developed septic shock. An exploratory laparotomy on the patient revealed bilateral ureteral injuries and urine in her abdomen. A urologist performed a repair procedure.

Based on his concern that these adverse incidents occurred in a short timeframe, Dr. Bergen discussed the situation with ARMC's Chief Medical Officer, Marilouise Venditti. Venditti believed a precautionary suspension was in order, so Dr. Bergen notified plaintiff on June 7, 2017 that his clinical privileges were being suspended. Venditti issued a letter the next day, informing plaintiff his privileges were precautionarily suspended pending an investigation and review by ARMC's Medical Executive Committee (MEC). The letter stated:

> This precautionary suspension is being taken because your continued practice of medicine may present a threat to the life, health or safety of any patient, employee or other person, and the failure to take prompt action may result in imminent danger to the health or safety of any person. Please note that we deemed this action necessary because of concerns raised during [three] recent cases [from] 2/5/17 . . ., 5/13/17 . . ., and

5

> 6/2/17 . . . . Of additional concern is the short time frame between the latter [two] cases.

The letter directed plaintiff to contact Dr. Bergen and arrange for alternate medical coverage for his hospitalized patients as well as patients who might require hospitalization while plaintiff's privileges remained suspended.

On June 21, 2017, the MEC and Dr. Bergen met to review the medical records involving the three adverse cases which prompted plaintiff's precautionary suspension. The MEC determined plaintiff's clinical privileges should be temporarily suspended and recommended that the Board of Trustees terminate his privileges permanently.

On June 26, 2017, Venditti sent a letter to plaintiff, notifying him of the MEC's decision to "continue the precautionary suspension and to also recommend termination of [his] clinical privileges and Medical Staff membership to the [ARMC] Board of Trustees." She wrote: "At this time you may not attend to patients or otherwise consult on a scheduled, routine or emergency basis at the hospital or utilize hospital facilities for any reason." Plaintiff timely requested a hearing before the Fair Hearing Committee (FHC) to challenge the MEC's recommendation. In a letter dated August 4, 2017, Venditti acknowledged plaintiff's request and advised that an FHC had been appointed. Additionally, Venditti informed plaintiff that since her June 26

6

A-0380-19

letter, "four additional cases of concern have been identified, two of which involve cesarean section deliveries with lacerations to the baby."[2]   Those four additional cases were described as follows:

Case Four - On December 11, 2016, plaintiff performed an emergency cesarean section.  Neonatology noted three shallow intraoperative lacerations over the baby's left lower chest.

Case Five - On February 17, 2017, plaintiff induced labor and left a sulcal tear in the patient.  Plaintiff sutured the tear and when bleeding did not subside, used vaginal packing.  Because the bleeding continued, another physician performed an exam under anesthesia and identified a third-degree vaginal laceration, which she repaired.

Case Six - On March 2, 2017, plaintiff performed an emergency cesarean section.  A 0.75 cm laceration on the baby's right canthus medium (eyelid) was attributed to delivery.  The baby was treated in the neonatal intensive care unit for heart issues and possible sepsis.

---

[2] Two of the four additional cases were assigned two case numbers (presumably for mother and child), so the record sometimes refers to six additional incidents or, when combined with the original three, nine adverse medical events.

A-0380-19

Case Seven - On March 3, 2017, plaintiff performed an abdominal myomectomy and excisional biopsy of a patient's uterine serosa. Plaintiff inadvertently cut the left uterine artery, which needed to be sutured.

The FHC conducted hearings in April and June 2018. Plaintiff was represented at the hearings by counsel and was provided with the medical records at issue. He also was permitted to call and cross-examine witnesses, and provide testimony from his own expert, Dr. Anthony C. Quartell.

ARMC presented testimony from Venditti and Dr. Bergen. Further, in preparation for the hearing, it retained Dr. Jay Goldberg as its obstetrical/gynecological expert. Based on Dr. Goldberg's review of the medical records, he found that the occurrence of numerous serious and rare adverse events within a six-month timeframe demonstrated plaintiff's clinical judgment, surgical skills, and regard for patient safety fell outside the standard of care. He wrote:

> Serious patient injuries, additional surgical procedures, prolonged hospitalizations, permanent scarring, additional use of resources, and additional medical costs resulted from Dr. McFarlane's numerous recent complications. It was lucky that none of these complications led to a patient's death. . . .
>
> These lapses in clinical judgment and surgical skill . . . have placed Dr. McFarlane's patients at an

unacceptable level of increased risk for morbidity and potential mortality.

Dr. Quartell reviewed the medical records and also prepared a report. He agreed plaintiff deviated from the standard of care in two cases, specifically when plaintiff inadvertently packed a patient's rectum instead of her vagina, and when he left a third-degree laceration of the patient's uterus undiagnosed. Moreover, Dr. Quartell agreed with Dr. Goldberg's opinion that because the multiple complications occurred within a six-month period, alarms were raised about plaintiff's surgical skills. Dr. Quartell stated:

> [I]t is Dr. Goldberg's opinion that these multiple recent complications within a [six-]month period from December 11, 2016 to June 2, 2017 raise serious alarms about Dr. McFarlane's surgical skills and possible impairment, also about his judgment, especially regarding the inexplicable placing with the vaginal pack in the rectum and the failure to recognize a [third] degree laceration. According to Dr. Goldberg, combining these numerous serious and rare adverse effects in such a short time frame placed Dr. McFarlane's care "far outside the standard of care." He concludes that both Dr. McFarlane and AtlantiCare become an unacceptably high risk for medical malpractice and that the patients have been placed at an unacceptable level of increased risk for morbidity and mortality. <u>I agree with the statements that Dr. Goldberg has made.</u> (Emphasis added.)

Dr. Quartell concluded that plaintiff's surgical privileges should not continue in an unsupervised manner and recommended that plaintiff only be allowed to operate under the proctorship of a senior gynecological surgeon.

Plaintiff also testified before the FHC. He conceded that in the case where he inadvertently packed a patient's rectum instead of her vagina, his actions constituted a lack of judgment and a deviation from the standard of care. As to his failure to recognize the intraoperative occurrence of small bowel and uterine perforations in a patient, he explained that the injuries occurred because he had misjudged the distance of the uterus. He denied transecting the ureter of the patient undergoing abdominal surgery, but he could not explain how the injuries occurred. Additionally, plaintiff conceded he would benefit from supervision during gynecological surgeries.

At no point during the hearing did plaintiff claim dyslexia was the cause of his performance issues. Indeed, although plaintiff's curriculum vitae, which was entered into evidence, reflected he was diagnosed with dyslexia in 2008, his attorney intentionally minimized the issue. For example, plaintiff's counsel stated at a prehearing conference, "I don't intend to ask anything about [plaintiff's] disability." Plaintiff's counsel also argued, "the fact [plaintiff] spent four years dyslexi[c] and overcame it, what does that have to do with anything?"

10

Further, in a discussion outside the presence of the FHC's panel in June 2018, and in response to his adversary's expressed intention to cross-examine plaintiff about his education, plaintiff's attorney stated:

> I deliberately and intentionally stayed away from anything to do with [plaintiff's] education. There is nothing sinister there. However, it is irrelevant. It opens the door and goes into areas that we didn't want to go into, and I can tell you . . . he has a dyslexia problem . . . . So, to open the door and go into a background which is irrelevant seems to me to be prejudicial.

In May 2018, after the FHC hearings were underway, SJFMC and plaintiff received notice that effective August 17, 2018, Horizon Healthcare of New Jersey, Inc. would terminate plaintiff's participation in the NJ TotalCare network. Horizon cited ARMC's suspension of plaintiff's clinical privileges as support for its determination that plaintiff no longer met the credentialing standards set forth in the Federally Qualified Health Center Agreement between SJFMC and Horizon.

Notwithstanding Horizon's action, on May 31, 2018, plaintiff and SJFMC executed an addendum to the agreement, which continued the agreement "in full force and effect" except as modified by the addendum, until October 2020. The addendum also provided that SJFMC would pay $24,000 of plaintiff's legal expenses to assist him in his appeal to regain hospital privileges. On August 14,

11

2018, several weeks after the addendum was executed, the FHC unanimously found plaintiff did not satisfy the burden of proof imposed on him by ARMC's bylaws to demonstrate the MEC's decision to suspend his clinical privileges was unreasonable, arbitrary or capricious. The FHC referred to three of the adverse outcomes it assessed: plaintiff's packing a patient's rectum rather than her vagina; his failure to recognize intraoperative perforations of a small bowel and uterus; and his failure to recognize a bilateral ureteral injury. The report from the FHC concluded that "although Dr. McFarlane seemed like a caring physician, the above-referenced cases and outcomes demonstrated a lack of surgical judgment and competence . . . so as to warrant termination of privileges in order to protect the safety of patients and also to protect the hospital from potential future liability . . . ." The FHC also determined "it did not seem feasible or appropriate to allow Dr. McFarlane to continue to practice even with proctoring, especially since ARMC does not serve as a training hospital."

Plaintiff requested that the MEC review the FHC's recommendation. On August 23, 2018, Venditti wrote to plaintiff advising him the MEC had unanimously affirmed its initial recommendation to terminate his clinical privileges at ARMC. Venditti further advised plaintiff of his right to appeal the adverse recommendation to the Appellate Review Committee of the Board of

12

Trustees (ARC). Plaintiff timely pursued this appellate review with the benefit of new counsel.

Before the ARC conducted its review, SJFMC terminated its employment contract with plaintiff. In fact, SJFMC terminated plaintiff on November 20, 2018, and ten days later,[3] plaintiff initiated the instant litigation.

When the ARC convened in December 2018, it considered the FHC's report along with the attorneys' submissions. However, prior to the commencement of the ARC's review, the parties disagreed on the materials to be considered. Specifically, the ARC initially received a submission from plaintiff which included a report and plaintiff's accompanying certification, in which he stated he was diagnosed with dyslexia in 2008 and that he suffered from attention deficit hyperactivity disorder. Further, plaintiff stated he sought an accommodation from ARMC, asking that he have only one twenty-four-hour call at the hospital each week plus one Saturday per month, and that he have available to him either a midwife or other trained professional to assist him in his surgical work. He also referenced an accommodation he sought from SJFMC concerning the number of hours he had to work and the number of patients he

---

[3] The documents in the record are not date-stamped so all filing dates are approximate. There is no dispute regarding the filing dates.

A-0380-19

needed to see in the office.  Additionally, he asked the ARC to remand the matter to the FHC to permit him to introduce evidence to show his dyslexia caused his surgical errors.  The attorney for the MEC opposed plaintiff's remand request and contended that not only was the dyslexia evidence plaintiff submitted to the ARC not provided to the FHC, but that plaintiff intentionally omitted this evidence from the record.

Due to the dispute over plaintiff's proposed submissions, counsel for the ARC wrote a letter to the parties on December 3, 2018, rejecting plaintiff's efforts to introduce new evidence of his dyslexia.  Counsel explained, "it seems self-evident that the parties should confine [w]ritten [s]ubmissions and [o]ral [a]rgument to the report, transcript and all other material considered by the [FHC] in making the adverse recommendation."  Counsel for the ARC also directed plaintiff's counsel to refer to plaintiff's disability only to the extent to which plaintiff's predecessor attorney and expert brought plaintiff's disability to the attention of the MEC, and further ordered plaintiff to "refrain from claiming that this disability caused or should excuse the surgical complications experienced by the patients of Dr. McFarlane . . . because no one asserted or advanced such a claim on behalf of Dr. McFarlane at any stage of the Fair Hearing process."

A-0380-19

Plaintiff revised his submissions to omit the prohibited references to his disability. However, he continued to request a remand to the FHC and asked the ARC to reconsider his burden of proof; alternatively, plaintiff asked that the ARC set aside the FHC's decision as arbitrary and capricious.

On January 18, 2019, the ARC affirmed the termination of plaintiff's hospital privileges. It found compelling that Drs. Goldberg and Quartell agreed in their testimony before the FHC that plaintiff could not practice alone. Further, the ARC determined there was ample evidence to support the FHC's finding "as to the unfeasibility of allowing Dr. McFarlane to continue to practice with proctoring" because ARMC has neither a teaching program nor "sufficient staffing to ensure the availability of a fully-privileged physician to monitor Dr. McFarlane (especially if an emergency arose in the case of a patient treated by Dr. McFarlane)." The ARC also deemed it significant that "even Dr. Quartell could not quantify how much proctoring Dr. McFarlane would require . . . to again allow him to safely practice medicine on his own . . . [and] Dr. Quartell could not predict that any amount or type of supervision would ultimately result in Dr. McFarlane again qualifying for full privileges."

The ARC further found:

> the [MEC] did not act in an arbitrary or capricious manner in not attempting "collegial intervention"

A-0380-19

before suspending privileges because the egregiousness of the mishaps occurring within a short period of time warranted doing so without engaging in remedial efforts, so as to protect the safety of hospital patients.

Finally, the ARC found no merit to plaintiff's contention that the termination of his privileges was arbitrary and capricious because Dr. Bergen, as Chairman of the Department of Obstetrics and Gynecology, had a conflict of interest as plaintiff's competitor. In fact, the ARC noted that a peer review not involving Dr. Bergen had identified several additional cases which called into question plaintiff's clinical competence. Although the ARC concluded the termination of plaintiff's hospital privileges would have an adverse effect on him, it determined "the egregious nature of the multiple surgical mishaps occurring over a short period of time left it no other alternative." The ARC stated that ARMC "must protect the safety and well-being of patients in the hospital."

Venditti notified plaintiff in her February 28, 2019 letter that "at its meeting on February 21, 2019, the AtlantiCare Board adopted the [ARC's] report and recommendation, affirming the [MEC's] decision to terminate clinical privileges and Medical Staff membership." Venditti further advised plaintiff that under ARMC's bylaws, plaintiff could not reapply for reappointment to the staff or for the "affected clinical privileges" for a period of two years.

16

Plaintiff's initial complaint from November 2018 against SJFMC, Flake, APG, and Dr. Bergen raised claims for breach of the covenant of good faith and fair dealing against SJFMC; violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111-12117, against SJFMC; tortious interference with contract against APG; and common law conspiracy against Flake and Dr. Bergen. Less than a week later, plaintiff filed an amended complaint, dropping the ADA claim but adding a claim against SJFMC for violation of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49. APG and Dr. Bergen filed an answer to this complaint, asserting a crossclaim against SJFMC, in January 2019.

In February 2019, SJFMC and Flake filed a motion to dismiss in lieu of an answer, and the following month, APG and Dr. Bergen requested leave to file a motion for summary judgment. The trial court denied these applications without prejudice, based on its contemporaneous decision to grant plaintiff's motion to file a second amended complaint.

Plaintiff's second amended complaint added as defendants ARMC, AtlantiCare Medical Staff of ARMC, and the Board of Governors of ARMC.[4]

---

[4] In May 2019, based on the entry of a consent order, the case caption was amended to exclude the Board of Governors of ARMC and the Medical Staff of

A-0380-19

In his second-amended complaint, he raised counts against these new defendants for violation of the LAD, violation of due process, and breach of contract; he also requested injunctive relief to restore his hospital practice privileges. Further, he raised the following claims against SJFMC and Flake:

1.  The employment contract between SJFMC and plaintiff gave rise to an implied covenant of good faith and fair dealing.

2.  Despite knowledge that ARMC had suspended plaintiff's clinical practice privileges and that New Jersey Blue Cross/Blue Shield had suspended his credentials, SJFMC extended plaintiff's original contract and assisted him with legal fees.

3.  Following the issuance of the [FHC] report, however, SJFMC cancelled plaintiff's contract without reason.

4.  The unilateral cancellation of his contract was unwarranted and improper.[5]

_____

ARMC.  Therefore, like the trial court, we collectively refer to the remaining AtlantiCare defendants—APG, Dr. Bergen, and ARMC—as "ARMC."

[5]  SJFMC argued before the trial court and maintains on appeal that plaintiff abandoned his breach of contract claim against SJFMC in the second amended complaint.  SJFMC asserts that paragraph seventeen of the first amended complaint claimed plaintiff's termination was "in direct violation" of the employment agreement between the parties, although plaintiff failed to allege which provision of the agreement SJFMC allegedly violated; on the other hand, SJFMC asserts plaintiff's second amended complaint did not allege a "direct violation" of the agreement, but rather, alleged only that his termination violated the implied covenant of good faith and fair dealing.

5. SJFMC and Flake were aware of his disability but cancelled his contract after he asked for an accommodation, in violation of the LAD.

6. On some unknown date, Flake and Dr. Bergen entered into an improper and unlawful conspiracy seeking to eliminate plaintiff's practice privileges and employment contract.

As to the ARMC defendants, plaintiff alleged, in part:

1. ARMC, and Dr. Bergen in particular, tortiously interfered with plaintiff's practice privileges and his relationship with SJFMC.

2. ARMC violated the LAD by refusing to honor plaintiff's request for an accommodation.

3. ARMC violated plaintiff's right to due process and a fair hearing by misallocating the burden of proof, limiting plaintiff's ability to be heard, mischaracterizing plaintiff's position, denying plaintiff a peer review process, and allowing an actor with a conflict of interest to participate in the proceedings.

4. ARMC violated contractual promises it made to plaintiff by violating its own bylaws.

By way of injunctive relief, plaintiff also asked that he be able to practice at ARMC under supervision.

On April 24, 2019, SJFMC and Flake moved to dismiss the second amended complaint. In May 2019, ARMC filed an answer to the second amended complaint. ARMC denied knowledge of plaintiff's factual allegations,

19

generally denied his legal allegations, asserted numerous affirmative defenses, and raised a crossclaim for contribution against SJFMC. Shortly thereafter, the trial court entered a consent order allowing ARMC to file a motion for summary judgment under seal.[6]

ARMC immediately moved for summary judgment and included with its filing a statement of 149 undisputed facts of record. In response, plaintiff submitted a certification that admitted all but a handful of ARMC's assertions.

Following oral argument on the motions, the judge entered orders on August 26, 2019, dismissing the complaint against SJFMC and Flake and granting summary judgment to the ARMC defendants. His orders were accompanied by a comprehensive, forty-two-page opinion, explaining his analyses on both applications. We first address the judge's award of summary judgment to the ARMC defendants, and then consider his dismissal order in favor of SJFMC and Flake.

---

[6] On appeal, we denied plaintiff's motion to seal the entire file, noting that "sealing the entire file is not necessary to protect patients' privacy, and such sealing would undermine the general policy of public access to court records not subject to exceptions set forth in Rule 1:38-3." However, we granted plaintiff's alternative motion to redact protected health information, pursuant to 45 C.F.R. 164.514.

## II.

The judge found ARMC was entitled to immunity under the federal Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101-11152, as well as New Jersey's peer review statute, N.J.S.A. 2A:84A-22.10(e)(2). Additionally, the judge determined there was sufficient, reliable evidence to support the hospital's decision to terminate plaintiff's practice privileges, so he declined to substitute his judgment for that of the hospital staff. Finally, the judge concluded that because ARMC "acted in good faith after fundamentally fair proceedings based upon sufficiently reliable evidence," plaintiff was estopped from bringing ancillary claims of tortious interference of contract, conspiracy, LAD violation, lack of due process, and breach of contract.

Regarding the dismissal motion, the judge construed counts one, two and four of plaintiff's second amended complaint to raise claims against SJFMC and Flake for: breach of contract and the implied covenant of good faith and fair dealing (count one); violation of New Jersey's LAD (count two); and civil conspiracy (count four).

In addressing count one, the judge set forth the elements required to establish a breach of contract claim. The judge found plaintiff pled that SJFMC and Flake "simply and improperly terminate[d] plaintiff's employment on

21

November 20, 2018" and that he also alleged he was "discharged . . . without cause."  The judge concluded the breach of contract claim in plaintiff's second amended complaint was deficient because plaintiff neglected to identify a provision of the employment agreement that SJFMC or Flake breached.  Also, the judge deemed plaintiff's breach of contract claim against Flake to be lacking since plaintiff failed to allege Flake was a party to the employment agreement.  The judge specifically concluded "the assertions regarding . . . Flake are insufficient to state a claim for breach of contract as to her."  Therefore, he dismissed plaintiff's breach of contract claim against both defendants.  In doing so, the judge further remarked that it appeared SJFMC and Flake "were within their contractual rights to terminate plaintiff's employment" for various reasons, including that when plaintiff was terminated by SJFMC in November 2018, Horizon already had removed plaintiff as a provider.[7]

---

[7] The record reflects SJFMC retained the right to terminate under the agreement and addendum if plaintiff was "unable . . . to perform any of his . . . duties" under the agreement or if he was "not providing adequate patient care or that the safety of patients [was] jeopardized by his . . . continued employment."  As already discussed, by August 2018, i.e., approximately two months after plaintiff and SJFMC executed the addendum, the FHC unanimously confirmed the recommendation to terminate plaintiff's privileges after concluding plaintiff "demonstrated a lack of surgical judgment and competence . . . so as to warrant termination of privileges in order to protect the safety of patients and also to protect the hospital from potential future liability."

The judge also dismissed plaintiff's claim for breach of the implied covenant of good faith and fair dealing because plaintiff failed to allege SJFMC or Flake "acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract." "Proof of 'bad motive or intention' is vital to an action for breach of the covenant." Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 225 (2005).

Regarding plaintiff's LAD claim under count two, the court concluded plaintiff pleaded only two of the four required elements to establish such a claim. Missing from his pleading were crucial facts to show he was qualified to perform the essential functions of his job, that he was performing at a level that met SJFMC's expectations, and that SJFMC sought another person to perform the same work. The judge further observed the LAD did not require SJFMC or Flake to eliminate the essential functions of plaintiff's job under the employment agreement by reducing plaintiff's patient schedule and hospital duties. Accordingly, the judge dismissed plaintiff's LAD claim.

Turning to count four, the judge observed that a civil conspiracy is defined as

> a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against

23

or injury upon another, and an overt act that results in damage.

[Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177 (2005) (quoting Morgan v. Union Cty. Bd. of Chosen Freeholders, 268 N.J. Super. 337, 364 (App. Div. 1993)).]

The judge concluded he had to dismiss count four because plaintiff failed to plead facts that demonstrated the necessary elements of a civil conspiracy. The judge determined plaintiff merely alleged SJFMC and Flake "[a]t some unknown date between May 1, 2017 and August 15, 2018, . . . entered an improper and unlawful conspiracy seeking to eliminate plaintiff from his privileges at ARMC and from his employment with" SJFMC.

Ultimately, the judge found that plaintiff bore the burden "to present competent evidence that he has stated the essential elements of his claims in Counts One, Two and Four . . . [but t]his burden is not met." Accordingly, the judge granted SJFMC's and Flake's motion to dismiss.

III.

On appeal, plaintiff presents the following arguments for our consideration:

Point I

The Trial Court Erred in Granting the ARMC Defendants' Motion for Summary Judgment Because

Plaintiff Was Entitled to the Benefit of All Reasonable Inferences.

A. The Trial Court Erred in Applying the Immunity Statute Because Dr. McFarlane Had Rebutted the Presumption of Immunity by Establishing that the Investigation and Hearing Were Not Fair.

i. Whether Defendants are Entitled to Immunity is a Factual Question Predicated on Whether Dr. McFarlane Was Granted a Fair Hearing.

ii. The ARMC Defendants did not engage in a "reasonable effort to obtain the facts of the matter.["]

iii. The ARMC Defendants Are Not Entitled to Immunity Under New Jersey Law Without First Permitting Dr. McFarlane Discovery.

B. The Trial Court Erred in Dismissing the Claims for Due Process Violations.

C. The Trial Court Erred in Finding Collateral Estoppel Barred Dr. McFarlane's Claims of LAD and Interference with a Contractual Right.

i. The Claims for a[n] LAD Violation Should Not Have Been Collaterally Estopped.

ii. The Tortious Interference Claim Should Not Have Been Collaterally Estopped.

Point II

Plaintiff Stated Claims against SJFMC and Flake.

A. Dr. McFarlane Made Out a Claim for Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing against [SJFMC and Flake].

B. The Trial Court Improperly Denied the LAD Claims Filed Against [SJFMC and Flake].

C. The Complaint Stated a Cause of Action for Conspiracy by All of the Defendants.

We are not persuaded. Accordingly, we affirm the challenged orders, mostly for the reasons set forth in the trial court's detailed opinion. We add the following comments.

We review a court's grant of summary judgment de novo, applying the same standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)). "Summary judgment is proper if, viewing the evidence in the light most favorable to the non-moving party, no genuine issue of material fact is disputed." Avis Budget Grp., Inc. v. City of Newark, 427 N.J. Super. 326, 337 (App. Div. 2012) (citing Brill v. Guardian

26

Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); accord Henry v. N.J. Dep't of Human Servs., 204 N.J. 320, 329 (2010).

Our review of a dismissal for failure to state a claim pursuant to Rule 4:6-2(e) is de novo, following the same standard as that of the trial court. Smerling v. Harrah's Entm't, Inc., 389 N.J. Super. 181, 186 (App Div. 2006); Banner v. Hoffman-La Roche Inc., 383 N.J. Super. 364, 373-74 (App. Div. 2006); Donato v. Moldow, 374 N.J. Super. 475, 483 (App. Div. 2005). "Thus, like the trial court, [we] must accept as true the facts alleged in the complaint, and credit all reasonable inferences of fact therefrom, to ascertain whether there is a claim upon which relief can be granted." Malik v. Ruttenberg, 398 N.J. Super. 489, 494 (App. Div. 2008).

In evaluating such a motion, "courts are cautioned to search the complaint 'in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement[,]'" Banco Popular, 184 N.J. at 165 (quoting Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989)), "particularly if further discovery is taken," id. at 183 (quoting Pressler & Verniero, Current N.J. Court Rules, comment 4.1 on R. 4:6-2 (2014)). However, the complaint must state "the facts on which the claim is based," R. 4:5-2, rather than relying on conclusory allegations or the assertion that

"essential facts that the court may find lacking can be dredged up in discovery," Printing Mart, 116 N.J. at 768; R. 4:5-2. Dismissal of a complaint "is mandated where the factual allegations are palpably insufficient to support a claim upon which relief can be granted." Rieder v. N.J. Dep't of Transp., 221 N.J. Super. 547, 552 (App. Div. 1987).

Where a dismissal motion is filed under Rule 4:6-2(e), and

> matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by R. 4:46, and all parties shall be given reasonable notice of the court's intention to treat the motion as one for summary judgment and a reasonable opportunity to present all material pertinent to such a motion.

> [Rule 4:6-2 (Emphasis added).][8]

---

[8] We are mindful that when the judge granted the SJFMC's and Flake's dismissal motion, he also stated that plaintiff, as well as SJFMC and Flake, asked him to consider facts outside of the pleadings, so the motion to dismiss was "converted to one of summary judgment" pursuant to Rule 4:6-2. However, the record does not reflect the judge provided the parties with the "reasonable notice of the court's intention to treat the motion to dismiss as one for summary judgment" as specifically required by the Rule. Further, SJFMC and Flake contend, without cross appealing, that they did not submit any materials outside the pleadings, other than the employment agreement and the addendum referenced in the second amended complaint, as permitted by Rule 4:6-2(e). In any event, plaintiff does not contest that the judge failed to notify the parties, before he ruled, of his intention to convert the dismissal motion to one of summary judgment or that the parties were afforded a "reasonable opportunity to present all material pertinent to such a motion," before the ruling. Also, the record is devoid of such notice and opportunity. More importantly, because the judge

Accordingly, "[t]he primary distinction between a motion under R[ule] 4:6-2(e) and R[ule] 4:46 is that the former is based on the pleadings themselves." Pressler & Verniero, Current N.J. Court Rules, cmt. 4.1.2 on R. 4:6-2 (2020); accord Hurwitz v. AHS Hosp. Corp., 438 N.J. Super. 269, 293-94 (App. Div. 2014).

Applying these standards, we conclude that the judge properly granted the summary judgment and dismissal motions.

ARMC's Summary Judgment Motion

Regarding Point I, plaintiff contends the motion judge erred in granting ARMC's motion for summary judgment because: ARMC failed to satisfy the fact-sensitive test under the HCQIA; the court failed to afford him the benefit of all contrary inferences; and the court compounded its errors by finding the claims which were ancillary to the privileges action could not be reviewed due to collateral estoppel. Plaintiff also asserts the motion judge should not have found the HCQIA conferred immunity on ARMC because ARMC did not

---

expressly entered an order granting SJFMC's and Flake's dismissal motion after finding plaintiff did not meet his burden in stating the essential elements of his claims against SJFMC and Flake, we consider the dismissal order consistent with Rule 4:6-2(e), rather than Rule 4:46.

"employ reasonable effort to ascertain the facts of the alleged medical quality event." Further, plaintiff argues the procedures ARMC employed were fundamentally unfair because he was not afforded an adequate opportunity to redact his submissions to the ARC to remove references to his disability, and that in any event, the ARC should have referred the matter back to the MEC for further review or remanded it to the FHC so the FHC could engage in further factfinding. Moreover, he contends that pursuant to New Jersey's peer review statute, a physician or committee is "not immune if the privileges were taken with malice." Also, because he contends there was a genuine dispute of material fact as to whether ARMC engaged in malice, the judge erred in granting summary judgment. These arguments are not persuasive.

Here, the record reflects plaintiff's finite disagreements with defendants' statement of material facts on the summary judgment motion were trivial, and mostly concerned the phrasing of ARMC's statements rather than their veracity. Furthermore, the issues before the trial court were legal: did the HCQIA immunize ARMC's decision to terminate plaintiff's practice privileges, and if so, was plaintiff estopped from raising ancillary claims? Our review of those issues is plenary. See Hurwitz, 438 N.J. Super. at 289 (noting that HCQIA immunity is a question of law for a court to decide).

The HCQIA, 42 U.S.C. § 11111(a)(1), limits damages for professional review actions as defined in 42 U.S.C. § 11151(9) by health care facilities if the professional review body meets the standards specified in 42 U.S.C. § 11112(a). The professional review body, any person acting as a member or staff to the body, and any person who assists the body with respect to the action "shall not be liable in damages under any law of the United States or of any State . . . ." 42 U.S.C. § 11111(a)(1). Such immunity, however, does not apply to damages under any law "relating to the civil rights of any person or persons." Ibid.

A "professional review action" is an action or recommendation of a professional review body that is based on "the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges . . . of the physician." 42 U.S.C. § 11151(9).

Here, the parties do not dispute that the revocation of plaintiff's clinical privileges by ARMC constitutes a professional review action as defined by the statute. As such, the action must comply with 42 U.S.C. § 11112(a), which provides:

31

For purposes of the protection set forth in [42 U.S.C. § 11111(a)], a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in [42 U.S.C. § 11111(a)] unless the presumption is rebutted by a preponderance of the evidence.

Federal courts have consistently upheld findings of immunity from monetary liability under the HCQIA. Hurwitz, 438 N.J. Super. at 290. One court explained:

Congress passed the [HCQIA] because it was concerned about "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care," and because "[t]here is a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(1), (2). Congress

32

viewed peer review as an important component of remedying these problems, but recognized that lawsuits for money damages dampened the willingness of people to participate in peer review. See Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 31 (1st Cir. 2002) ("Before passage of the HCQIA in 1986, threats of antitrust actions and other lawsuits often deterred health care entities from conducting effective peer review."). Accordingly, Congress "grant[ed] limited immunity from suits for money damages to participants in professional review actions." Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 632 (3d Cir. 1996).

[Poliner v. Tex. Health Sys., 537 F.3d 368, 376 (5th Cir. 2008) (alterations in original).]

Courts have recognized that the strong legislative policy underlying the HCQIA requires reviewing courts to refrain from substituting their "judgment for that of the hospital's governing board or to reweigh the evidence regarding the renewal or termination of medical staff privileges." Hurwitz, 438 N.J. Super. at 290 (quoting Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1337 (11th Cir. 1994)). Thus, deference must be afforded "to hospitals, their peer reviewers, and their internal decision-makers." Ibid. (citing Harris v. Bradley Mem'l Hosp. & Health Ctr., 306 Conn. 304, 334 (2012)); see also Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 90 (App. Div. 1986) (observing that "[h]ospital officials are vested with wide managerial discretion, to be used to elevate hospital standards and to better medical care"). "So long as hospital

decisions concerning medical staff are reasonable, are consist[e]nt with the public interest, and further the health care mission of the hospital, the courts will not interfere." Hurwitz, 438 N.J. Super. at 296 (quoting Zoneraich, 212 N.J. Super. at 90).

New Jersey also has an immunity statute, N.J.S.A. 2A:84A-22.10, which provides broad immunity from damages to qualified persons for actions taken as part of a hospital's peer review process. That statute provides:

> Any person who serves as a member of, is staff to, under a contract or other formal agreement with, participates with or assists with respect to an action of:
>
> . . . .
>
> d. A hospital peer review committee having the responsibility for the review . . . of questions of the clinical or administrative competence of physicians or dentists . . . , or of matters concerning limiting the scope of hospital privileges of physicians or dentists on staff . . . .
>
> . . . .
>
> shall not be liable in damages to any person for any action taken or recommendation made by him [or her] within the scope of his [or her] function with the committee, subcommittee or society in the performance of said peer-review, ethics, grievance, judicial, quality assurance or professional relations review functions, if such action or recommendation was taken or made without malice and in the reasonable belief after reasonable investigation that such action or

34

> recommendation was warranted upon the basis of facts disclosed.
>
> [N.J.S.A. 2A:84A-22.10.]

The Hurwitz court noted that N.J.S.A. 2A:84A-22.10 "has been cited only infrequently in published case law, at times just in passing." 438 N.J. Super. at 291. Because the case law interpreting the HCQIA is much better developed and because a finding of immunity under the HCQIA would obviate the need for an analysis under state statutes, we do not consider whether ARMC would be entitled to immunity under N.J.S.A. 2A:84A-22.10.

Applying the facts of the matter at hand to the requirements of 42 U.S.C. § 11112(a), we are persuaded immunity was properly extended to ARMC's revocation of plaintiff's clinical privileges. In reaching this conclusion, we recognize that ARMC's internal review process enjoys a presumption of immunity and plaintiff bore the burden of showing by a preponderance of the evidence that it failed to meet the statutory requirements. 42 U.S.C. § 11112(a). He did not meet that burden.

In Hurwitz, the court explained that the analysis applied in Zoneraich, based on common law precepts of fundamental fairness, corresponds well with the concepts set forth in 42 U.S.C. § 11112(a). "Judicial review of [a] hospital board action 'should properly focus on the reasonableness of the action taken in

relation to the several interests of the public, the [physician], and the hospital.'"

Zoneraich, 212 N.J. Super. at 91 (quoting Garrow v. Elizabeth Gen. Hosp. & Dispensary, 79 N.J. 549, 565 (1979)). "'[T]he record should contain sufficient reliable evidence, even though of a hearsay nature, to justify the result.'" Ibid. (quoting Garrow, 79 N.J. at 565).

Comparing the Zoneraich standard to that of the HCQIA, the Hurwitz court observed:

> The "reasonable belief" concepts in subsections (a)(1) and (a)(4) of Section 11112 are objective standards. In fact, as the House Committee report explains, the drafters of the federal immunity revised the bill to replace a "good faith" requirement contained in an earlier version to "a more objective 'reasonable belief'" standard. H.R. Rep. No. 99-903, at 10 (1986), reprinted in 1986 U.S.C.C.A.N. 6392-93. The Committee noted "concerns that 'good faith' might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action." Ibid. The Committee further declared its intention that the "reasonable belief" test "will be satisfied if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." Ibid. The Committee also expressed its "belief that this standard will be met in the overwhelming majority of professional review actions[.]" Ibid. (emphasis added). Consistent with the drafters' intent, case law has repeatedly treated the "reasonable belief" test under the statute as an objective test.

36

[Hurwitz, 438 N.J. Super. at 297-98 (emphasis in original) (footnote omitted).]

The reasoning set forth in Hurwitz accords with the analysis applied by the federal circuits. See, e.g., Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 840 (3d Cir. 1999) (articulating that reasonable belief standard is satisfied if reviewers with information available to them at the time of professional review action would reasonably have concluded that their actions would restrict incompetent behavior or protect patients).

Applying the HCQIA standards here, we are convinced plaintiff was afforded a procedurally fair opportunity to be heard during ARMC's internal review process. The adverse incidents in question took place during the winter of 2016 through the spring of 2017, and plaintiff received notice of the temporary suspension of his privileges in June 2017. The Fair Hearing did not commence until April 2018. During this interim period plaintiff retained counsel and hired an expert to review the medical records of the patients at issue. The hearing took place over four days, at which time plaintiff had the opportunity to cross-examine ARMC's witnesses, present witnesses of his own, and testify on his own behalf. He then was afforded a two-level review process, first appealing the FHC's recommendation to the MEC and then the ARC. Also,

37

plaintiff was represented by counsel and able to submit briefs and written statements to support his appeals.

Moreover, the record reflects ARMC made a reasonable effort to ascertain the facts of the matter. Prior to the Fair Hearing, the MEC asked peer reviewers other than Dr. Bergen and Venditti to examine all of plaintiff's patient outcomes. It then retained its own medical expert to review the patient outcomes identified as adverse. Finally, the FHC heard four days of testimony and considered voluminous submissions before reaching its decision.

The evidence obtained during this process amply supports the conclusion that ARMC had a reasonable belief its action was necessary to protect the hospital and patients from plaintiff's incompetence. We also observe plaintiff self-identified three adverse patient outcomes and brought this information to Dr. Bergen's attention. Further, peer reviewers for the MEC identified six more adverse outcomes suffered by plaintiff's patients before plaintiff was terminated. While no patients died due to plaintiff's errors, some of the complications the patients experienced were severe. Significantly, plaintiff's own expert conceded that plaintiff's packing one patient's rectum instead of her vagina, and his failing to diagnose a severe uterine laceration in another fell below the standard of care

38

expected of a physician. Also, plaintiff himself admitted he was careless in the packing incident and could offer no explanation for the undiagnosed laceration.

Thus, ARMC acted "in the reasonable belief that the action was in the furtherance of quality health care," 42 U.S.C. § 11112(a)(1), "after a reasonable effort to obtain the facts of the matter," 42 U.S.C. § 11112(a)(2), and "after adequate notice and hearing procedures [were] afforded to the physician involved," 42 U.S.C. § 11112(a)(3). Finally, ARMC revoked plaintiff's privileges "in the reasonable belief that the action was warranted by the facts known" after a reasonable effort to obtain the facts and after affording plaintiff adequate notice and hearing procedures. 42 U.S.C. § 11112(a)(4). Because ARMC complied with the requirements placed on a professional review action by 42 U.S.C. § 11112(a), it is entitled to immunity from suit.

Although plaintiff argues he was unfairly treated because he was not given enough time to properly redact his submission to the ARC, we find this argument lacking in merit for a number of reasons. First, plaintiff raised the disability issue for the first time before the ARC. Not only did he not raise it before the FHC, but his counsel also specifically requested that opposing counsel refrain from mentioning it. Second, plaintiff knew for days that the MEC asked that any disability references be excised from his submissions, and counsel for the

A-0380-19

ARC wrote a letter explaining the decision to disallow that evidence. ARC's counsel's letter was dated December 3, 2018, and the ARC hearing did not occur until December 6, 2018. Thus, the direction to redact the references from his submissions should not have come as a surprise and plaintiff should have been prepared for it.

Even if the ARC could have afforded plaintiff more time to redact his submissions, "[t]he HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability for its ultimate decision." Brader, 167 F.3d at 842 (quoting Fobbs v. Holy Cross Health Sys. Corp., 789 F. Supp. 1054, 1065 (E.D. Cal. 1992), aff'd, 29 F.3d 1439 (9th Cir. 1994)). Reasonableness is determined from the information available "at the time of the professional review action." Id. at 840 (emphasis supplied). Here, the actions of the higher-level peer review panel do not reflect its recommendation was made without a reasonable belief that the recommendation would further quality health care. Hurwitz, 438 N.J. Super. at 302-03.

Finally, plaintiff's contention that he should have been allowed to conduct discovery to prove that Dr. Bergen acted with malice fails for two reasons. First, a lack of discovery is not a reason to reverse the lower court's finding of HCQIA

immunity. Issues involving immunity in a statutory immunity case should be adjudicated at an early stage of the litigation because an unfettered right to discovery would dilute the practical benefit of the immunity protections. Hurwitz, 438 N.J. Super. at 305; Gomes v. Cty. of Monmouth, 444 N.J. Super. 479, 487 (App. Div. 2016). Moreover, in an "HCQIA immunity contest, . . . the subjective bias or bad faith motives of the peer reviewers is irrelevant." Lee v. Trinity Lutheran Hosp., 408 F.3d 1064, 1072 (8th Cir. 2005) (quoting Sugarbaker v. SSM Health Care, 190 F.3d 905, 914 (8th Cir. 1999)); see Poliner, 537 F.3d at 380 n.37 ("[T]he circuits that have considered the issue all agree that the subjective bias or bad faith motives of the peer reviewers is irrelevant."); Cf. Hurwitz, 438 N.J. Super. at 297-98. Thus, the test is whether the review panel acted in an objectively reasonable manner to protect the safety and well-being of the public, not whether Dr. Bergen subjectively harbored improper motives. Accordingly allowing plaintiff to conduct discovery regarding Dr. Bergen's motives would have been contrary to the purposes of statutory immunity and could have had no effect on the court's finding.

Given our conclusions, we are satisfied there is no basis to reverse the judge's findings regarding ARMC's immunity from suit for damages caused by the revocation of plaintiff's clinical privileges.

41

We also are not convinced the motion judge erred by dismissing plaintiff's claims for due process violations, tortious interference with contract, and injunctive relief. ARMC is immune from suit for tortious interference with contract under 42 U.S.C. § 11111(a), which grants immunity to professional review bodies "under any law of the United States or of any State." The sole exception to the grant of immunity is for laws relating to civil rights. Tortious interference with a contract does not relate to civil rights. Thus, the trial court properly dismissed this claim.

Next, we note plaintiff sought injunctive relief to restore his hospital privileges and asked that the judge order that he receive appropriate supervision. But because plaintiff's action against ARMC failed due to HCQIA immunity, the decision to revoke his clinical privileges had to be left undisturbed. That is to say, given that ARMC legally revoked plaintiff's clinical privileges, the judge could not order them to be reinstated. See Hurwitz, 438 N.J. Super. at 296 (holding that courts will not interfere with hospital decisions concerning medical staff); Zoneraich, 212 N.J. Super. at 90 (same). Therefore, the judge properly dismissed the injunctive relief claim.

Finally, plaintiff cannot prevail on a procedural due process claim against ARMC. In Moore v. Williamsburg Regional Hospital, 560 F.3d 166, 178-79

A-0380-19

(4th Cir. 2009), the court, under 42 U.S.C. § 1983, rejected the plaintiff's claim against a hospital for depriving him of his medical practice in violation of the Due Process Clause of the Fourteenth Amendment. The court recognized that a § 1983 action is a civil rights claim, and therefore HCQIA did not immunize the hospital from damages. Id. at 178. Nevertheless, it found the hospital was not a State actor because there was not a sufficiently close nexus between the State and the hospital. Ibid. The court based its finding on the fact that the State bore no responsibility for the actions of the hospital's professional review board. Id. at 179. Here, because ARMC's revocation of plaintiff's privileges did not constitute a State action, a constitutional due process challenge was not sustainable.

Even if we read plaintiff's allegation to simply assert that ARMC failed to follow its own review procedures, that claim, too, must fail. If a procedural due process claim is not brought under the civil rights statutes, then HCQIA immunity acts to bar it.[9] Moreover, even if considered, the claim is meritless. The court's reasoning in Moore is instructive:

---

[9] To the extent plaintiff relies on the New Jersey immunity statute, N.J.S.A. 2A:84A-22.10, as establishing the procedural requirements, a violation of that statute would not trump the immunity provided by the HCQIA. See 42 U.S.C. § 11111(c) (providing that 42 U.S.C. § 11111(a) shall apply to state laws for

Plaintiff . . . alleges that [the hospital] did not provide him adequate procedures when it deprived him of his property right in his medical practice. Plaintiff's claim fails because the procedures [the hospital] afforded him exceed[ed] the constitutional threshold established by Mathews v. Eldridge, 424 U.S. 319 . . . (1976). Plaintiff was notified of the allegations against him, given ample opportunity to present evidence, allowed to call and cross-examine witnesses, and was represented by counsel throughout. There was no procedural due process violation.

[560 F.3d at 180.]

Like the plaintiff in Moore, here, plaintiff had notice, an opportunity to be heard, and the ability to call and cross-examine witnesses, all while represented by counsel. Accordingly, his due process rights were not violated.

In short, the motion judge did not err in dismissing plaintiff's claims for tortious interference with contract, injunctive relief, or violation of due process.

---

professional review actions commenced on or after October 14, 1989). Under the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, any state law that that interferes with or is contrary to the laws of Congress is invalid. State v. Rackis, 333 N.J. Super. 332, 339 (App. Div. 2000). Federal preemption may be express, or implied where Congress suggests an intent to occupy an entire field to the exclusion of state legislation. Ibid. The explicit language of 42 U.S.C. § 11111(c) makes clear Congress intended the HCQIA to be the law that governed hospital professional review boards. Thus, whether the procedures afforded plaintiff satisfied the requirements of N.J.S.A. 2A:84A-22.10 is immaterial. Once immunity is conferred by the HCQIA, such immunity cannot be abrogated by state laws that impose additional procedural requirements.

Regarding Point I(C)(i) and (ii), plaintiff argues the motion judge erred in finding plaintiff was collaterally estopped from raising claims of violation of the LAD and tortious interference with contract. He contends the LAD claims should not have been dismissed due to the significant public policy considerations underlying that statute. As for his tortious interference claims, plaintiff contends that because Dr. Bergen reaped a financial benefit from the revocation of his privileges, plaintiff was entitled to discovery on this issue. Again, we are not convinced.

The reasons supporting the dismissal of plaintiff's tortious interference claim have already been discussed. Dr. Bergen's alleged conflict of interest is immaterial to the issue of HCQIA immunity because a court applies an objective standard in determining the reasonableness of a professional board's action. Hurwitz, 438 N.J. Super. at 297-98. Because the actions of ARMC were objectively reasonable and HCQIA immunity applies, plaintiff is estopped from raising a tortious interference with contract claim.

We recognize plaintiff's LAD claim is a different matter. The HCQIA specifically exempts civil rights claims from the immunity it accords medical review boards. 42 U.S.C. § 11111(a)(1). Accordingly, we are satisfied the trial court here erred by not recognizing this, instead finding the "ancillary" LAD

45

claims were barred by HCQIA immunity. Nonetheless, we are satisfied the dismissal of plaintiff's LAD claims was proper. See Buccinna v. Micheletti, 311 N.J. Super. 557, 563 (App. Div. 1998) (noting that appeals are from judgments, not reasons given by trial judge).

In Pamintuan v. Nanticoke Memorial Hospital, 192 F.3d 378, 383-84 (3d Cir. 1999), the plaintiff physician raised claims of discrimination under 42 U.S.C. § 1981 after her clinical privileges were suspended by the defendant hospital. Recognizing that HCQIA immunity was irrelevant, the court applied the McDonnell Douglas[10] burden-shifting framework used in Title VII discrimination cases to the defendant's motion for summary judgment. 192 F.3d at 385-86. The court explained that under the McDonnell Douglas analysis, a plaintiff must present a prima facie case of discrimination to establish the defendant intentionally discriminated against him or her. Id. at 385. Once a prima facie case is established, the burden shifts to the defendant to provide legitimate, non-discriminatory reasons for its actions. Ibid. If it is able to provide such justification, the burden shifts back to the plaintiff to provide some evidence that these reasons are pretextual. Id. at 385-86.

> To avoid summary judgment, the plaintiff's evidence
> rebutting the employer's proffered legitimate reasons

---

[10] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

[Id. at 386 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).]

In Pamintuan, the court observed that after a multi-level review, the hospital found the suspension of the plaintiff's privileges was justified by her behavior, which presented serious quality of care concerns for the hospital's patients. Ibid. The hospital cited the plaintiff's "pattern of inadequate record-keeping, delays in providing treatment, poor medical judgment, and disregard of hospital policies, as the reasons supporting its decision." Ibid. The court found that this showing was adequate to shift the burden back to the plaintiff to "'demonstrate such weaknesses, implausibilities, inconsistences, incoherencies, or contradictions' in the hospital's proffered reasons that a reasonable fact-finder could conclude that the reasons were pretextual and that the hospital had a discriminatory motive." Ibid. (quoting Fuentes, 32 F.3d at 764).

To refute the defendant's proffered reasons, the plaintiff alleged that Caucasian physicians also had charting and timeliness problems but had not been disciplined. Ibid. She also argued her own statements denying she suffered from significant clinical deficiencies were sufficient to create a question for the

47

finder of fact. Id. at 387. The court acknowledged that a plaintiff's affidavit providing circumstantial evidence of discrimination may sometimes be sufficient to withstand a defendant's motion for summary judgment, but it determined such was not the case based on plaintiff's uncorroborated statements. Ibid. The court concluded:

> [the plaintiff's] evidence was, for the most part, anecdotal and inadmissible . . . . In short, [the plaintiff] has pointed to no substantial evidence that contradicts or undermines [the defendant's] legitimate reason for her suspension—concern about the quality of care that she was providing.
>
> Thus, [the plaintiff] has failed to submit evidence from which a reasonable factfinder could conclude that [the defendant's] proffered legitimate, non-discriminatory reasons for her suspension were pretextual. [The plaintiff] was accorded a lengthy and intense review process. Throughout the process, she was treated the same as any other physician. Although she contends that the ultimate decision reached by her peers was incorrect, more must be shown to survive summary judgment.
>
> [Id. at 387-88.]

New Jersey, like the federal courts, has adopted the burden-shifting methodology articulated in McDonnell Douglas to analyze allegations of discriminatory intent. Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005). The burdens imposed by McDonnell Douglas in the LAD context are identical

48

to those set forth in <u>Pamintuan</u>. <u>Id.</u> at 447-50 (setting forth elements of <u>McDonnell Douglas</u> analysis).

Here, plaintiff asserts ARMC discriminated against him due to its failure to accommodate his dyslexia by reducing his working hours and providing him with adequate supervision. N.J.S.A. 10:5-5(q). His discrimination claim does not include an allegation ARMC erred in finding he deviated from accepted standards of care or in its concern for patient safety. Thus, his claim is akin to a discriminatory discharge for failure to accommodate.

> A prima facie case of discriminatory discharge for failure to accommodate an employee's handicapped status under the LAD requires the employee to present proof that (1) the employee was handicapped, (2) he was otherwise qualified to perform the essential functions of the job, with or without the accommodation by the employer, and was performing at a level that met the employer's expectations, (3) he was fired, and (4) the employer then sought someone to perform the same work.
>
> [<u>Muller v. Exxon Research & Eng'g Co.</u>, 345 N.J. Super. 595, 602 (App. Div. 2001).]

"[N]othing in the LAD is construed to prevent the termination of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment." <u>Svarnas v. AT&T Commc'ns</u>, 326 N.J. Super. 59, 73 (App. Div. 1999) (citing N.J.S.A. 10:5-2.1). "An

49

employer is not required to comply with every request of a disabled employee in order to avoid a jury trial in a LAD case," Jones v. Aluminum Shapes, Inc., 339 N.J. Super. 412, 428 (App. Div. 2001), nor is an employer required to accommodate an employee "with light-duty assignments and an indefinite part-time work schedule," Muller, 345 N.J. Super. at 606.

Guided by these principles, we are persuaded plaintiff failed to establish a prima facie case of discriminatory discharge. While he did prove: he was handicapped; his privileges were revoked; and Dr. Bergen began treating his patients, he did not show he was qualified to do the job for which he contracted, even with an accommodation, or that he was performing the job at a level that met ARMC's expectations. Indeed, the findings of the professional review board to the contrary were reasonable and well supported by the evidence, given that over a short period of time, several patients experienced serious complications due to plaintiff's lack of judgment or surgical skill. Also, during plaintiff's testimony before the FHC, he conceded his treatment of some patients deviated from accepted standards of care. Significantly, plaintiff's request for supervision did not specify the type of supervision required, who would supervise him, how long the supervision would continue, or how it would be determined when the supervision should end. In fact, other than his bald

assertion that he was entitled to supervision, he did not explain how such supervision would compensate for his dyslexia or improve his surgical performance. He also did not show that ARMC had the staff to provide the supervision he needed or that it could accommodate the reduced working hours he requested. Because plaintiff failed to establish a prima facie case of discriminatory discharge, and in any event, failed to show that ARMC's reasons for its actions were pretextual, the trial court did not err in granting summary judgment in favor of ARMC on plaintiff's LAD claims.

<u>SJFMC's and Flake's Motion to Dismiss</u>

Regarding Point II, plaintiff argues the trial court misapplied the law in finding that his second amended complaint failed to state any claims against SJFMC or Flake upon which relief could be granted. He specifically contends he made out claims for breach of contract and for breach of the duty of good faith and fair dealing sufficient to survive a pre-discovery motion to dismiss, and the judge failed to give him the benefit of all possible inferences. He relies heavily on the fact that SJFMC renewed his contract even though it knew his privileges were suspended and Horizon had dropped him as an approved provider. Also, he asserts that "SJFMC breached the implied covenant by extending [his] contract in light of the temporary suspension, and then

A-0380-19

terminating the agreement even though the ARMC had not taken final action."

Additionally, he argues his LAD claims against SJFMC should not have been dismissed without discovery because there was no proof he was unable to perform his basic job functions. Similarly, he contends his cause of action for conspiracy should have survived because defendants acted in concert to deprive him of his hospital practice privileges. We are not convinced.

As is evident from the procedural history we have recounted, the trial court permitted plaintiff to amend his pleadings more than once. In plaintiff's initial complaint, he alleged SJFMC and Flake discharged him "in direct violation of its contract and in breach of the covenant of good faith and fair dealing." In his second amended complaint, however, plaintiff altered this allegation by asserting that SJFMC "simply and improperly terminate[d]" his employment, that "[s]uch action also violated the covenant of good faith and fair dealing," and he was discharged "without cause, even though the contract required certain cause for discharge."

When the judge outlined the legal standards governing a motion to dismiss, he explicitly recognized that Rule 4:5-2 requires a plaintiff to "plead sufficient facts to give rise to a cause of action" and that "conclusions paired with an intention to rely on discovery" do not satisfy the Rule. After liberally

construing the second amended complaint to include a breach of contract claim, the judge found plaintiff did not identify what provision of the employment agreement SJFMC failed to perform. Moreover, the judge found plaintiff did not plead that Flake was a party to the employment agreement. He therefore dismissed the breach of contract claim against both defendants. Given our independent review of the record, we discern no basis to disagree with the trial court's legal conclusion. See EnviroFinance Grp., LLC v. Envtl. Barrier Co., 440 N.J. Super. 325, 345 (App. Div. 2015) ("To prevail on a breach of contract claim, a party must prove a valid contract between the parties, the opposing party's failure to perform a defined obligation under the contract, and the breach caused the claimant to sustain[] damages."). Indeed, while there is no question a valid contract existed between plaintiff and SJFMC, plaintiff did not allege SJFMC failed to perform a defined obligation under the contract, nor did he plead that Flake was a party to the employment agreement. He also did not contest that his hospital privileges were suspended, Horizon removed him as a provider, or that he failed to meet SJFMC's quality standards and provide adequate patient care in certain instances. Therefore, plaintiff is hard pressed to contest the judge's conclusion that SJFMC was within its contractual rights to terminate plaintiff's employment. This is particularly true because the May 31,

53

2018 addendum did not nullify the August 6, 2015 agreement. Instead, the addendum provided that "[e]xcept as specifically modified herein . . ., the [a]greement shall remain in full force and effect." Therefore, the addendum continued plaintiff's obligation under the agreement to maintain provider status with medical insurers and to maintain privileges at ARMC. Importantly, the record also reflects SJFMC honored its obligations under the agreement until the MEC unanimously confirmed its recommendation to terminate plaintiff's clinical privileges. Once the MEC took this action, it was plaintiff who failed to perform a defined obligation under the agreement.

Likewise, we are not persuaded the judge erred in dismissing plaintiff's claim for breach of the implied covenant of good faith and fair dealing. "[I]n New Jersey the covenant of good faith and fair dealing is contained in all contracts and mandates that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" Seidenberg v. Summit Bank, 348 N.J. Super. 243, 253 (App. Div. 2002) (quoting Sons of Thunder v. Borden, Inc., 148 N.J. 396, 420 (1997)). "The party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the

bargain originally intended by the parties.'" Brunswick, 182 N.J. at 225 (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001)). Also, in New Jersey, the "implied covenant of good faith and fair dealing cannot override an express term in a contract." Wilson, 168 N.J. at 244.

Here, as the judge noted, plaintiff alleged no specific act of bad faith committed by SJFMC in performing its contractual obligations. Also, as already noted, plaintiff did not allege Flake was a party to the agreement. Further, plaintiff's mere allegations that Flake canceled a meeting and terminated his employment after plaintiff sought a disability accommodation was insufficient to sustain a claim for breach of the implied covenant of good faith and fair dealing.

Additionally, the covenant of good faith and fair dealing could not trump SJFMC's express right to terminate the agreement for the reasons outlined in the agreement. Moreover, even indulging plaintiff's claim that SJFMC had improper motives in terminating him after he requested a meeting to discuss an accommodation, nothing in the contract imposed a contractual obligation on SJFMC to hold such a meeting. Also, to the extent plaintiff stated sufficient facts concerning SJFMC's failure to discuss an accommodation to survive a Rule 4:6-2(e) motion, his remedy would have been rooted in the LAD, not in contract.

Finally, SJFMC's extension of plaintiff's contract and its offer to contribute to his legal fees to fight his privileges suspension can only be interpreted as an act of good faith. If SJFMC wanted to discharge plaintiff, all it needed to do was let the agreement expire in August 2018. Instead, it expended time and money to preserve plaintiff's employment for a period of time. It is not clear how plaintiff can interpret these actions as bad faith. Given these conclusions, we are not persuaded the motion judge erred by dismissing plaintiff's claim for breach of the implied covenants of good faith and fair dealing.

Regarding Point II(B), plaintiff argues his LAD claims against SJFMC should not have been dismissed without discovery. He contends that because he was adequately performing under the employment agreement and SJFMC terminated him immediately after he requested an accommodation, he sufficiently stated a claim for disability discrimination. Further, he asserts the dismissal of his LAD claim contravened the purposes of the LAD and makes for bad public policy. Again, we disagree.

As we have discussed, to prove a case of failure to accommodate under the LAD, plaintiff was required to present proof he was disabled, that he was otherwise qualified to perform the essential functions of the job with or without an accommodation, that he was performing at a level that met the employer's

A-0380-19

expectations, that he was fired, and that the employer sought someone else to perform the same work.  Muller, 345 N.J. Super. at 602.  The LAD does not prevent the termination of an employee, who, in the employer's reasonable opinion, is unable to adequately perform the duties of employment.  Svarnas, 326 N.J. Super. at 73.  An employer need not comply with every request for an accommodation and need not accommodate an employee with light-duty assignments and a reduced work schedule.  Jones, 339 N.J. Super. at 428; Muller, 345 N.J. Super. at 606.

Here, plaintiff admitted both at the Fair Hearing and in his responses to ARMC's statement of material facts that his medical performance fell below the accepted standards of obstetrical and gynecological care.  Additionally, he admitted that his practice privileges at ARMC were suspended in August 2018, with only one last appeal open to him, and that Horizon dropped him as a care provider in May 2018.  Thus, he was unable to treat SJFMC patients in the hospital, was unable to treat them in the office if they were insured by Horizon, and he was not performing as expected under his employment agreement at the time of his termination.

Even granting plaintiff the benefit of the inference that Flake refused to meet with him because she was unwilling to grant him an accommodation, her

behavior in doing so did not violate the LAD. Although plaintiff asked that he be supervised or mentored by an experienced physician and that his working hours be reduced, SJFMC was under no obligation to accede to his requests. We also note plaintiff presents no proof that SJFMC provided similar accommodations to other employees, or that it had the available staff to supervise him and cover his patient load.

Plaintiff argues in Point II(C) that his claim for civil conspiracy was sufficiently pled to survive the motion to dismiss, and that even without discovery, he showed that Dr. Bergen conspired with Flake to suspend his privileges and replace him at SJFMC.[11] These arguments, too, are unavailing.

Plaintiff's second amended complaint asserted the following claim for common law conspiracy:

> 47. At some unknown date between May 1, 2017 and August 15, 2018, Defendants [Dr.] Blair Bergen, Linda Flake, John Doe and Richard Roe entered into an improper and unlawful conspiracy seeking to eliminate Plaintiff from his privileges at ARMC and from his employment with Southern Jersey Family Medical Centers, Inc.

---

[11] The complaint alleges common law conspiracy "as to all defendants." However, as discussed previously, ARMC and Dr. Bergen are immunized from a conspiracy claim by the HCQIA. Thus, the only named defendant against whom this claim could be brought was Flake.

48. Dr. Bergen used his position as department Chairman to obtain a temporary suspension of Dr. McFarlane's privileges, and to manipulate the proceedings thereunder and took other offensive actions to the detriment of Plaintiff, including discriminating against Plaintiff in violation of LAD.

49. Linda Flake refused to alter Dr. McFarlane's schedule and failed to respond in a timely fashion to inquiries regarding Plaintiff's difficulties from "Multi Plan" and "Horizon Blue Cross Blue Shield of New Jersey," and to even meet to discuss accommodations requested under LAD, and engaged in other actions to the detriment of the Plaintiff.

50. The ARMC Defendants acted in concert with Linda Flake and Dr. Bergen to revoke Plaintiff's hospital privileges and interfere with his medical practice.

51. The actions of Defendants have been willful and malicious seeking to injure Plaintiff, his reputation, and his professional good will.

As we have mentioned, the judge found plaintiff failed to allege facts that demonstrated a scheme, understood by all defendants, to act in concert to commit an unlawful act or to commit a lawful act by unlawful means to "inflict a wrong against or injury upon another." Banco Popular, 184 N.J. at 177. We discern no basis to disagree with that conclusion, particularly since plaintiff's allegations under count four failed to identify the nature of any agreement between Flake and Dr. Bergen, when it occurred, or how it was carried out.

59

More importantly, plaintiff failed to allege facts showing that the purported scheme involved an <u>unlawful act</u>. Because the actions of Dr. Bergen and ARMC are entitled to immunity under the HCQIA, Dr. Bergen's referral of plaintiff's adverse patient outcomes to the MEC was not only legal but was afforded protection at law. Also, Flake's refusal to alter plaintiff's working schedule was not unlawful. While Flake's refusal to discuss an LAD accommodation under some circumstances not present here might be illegal, in this instance, plaintiff did not explain how such conduct involved Dr. Bergen or how Flake took these actions "in concert" with Bergen. We also note that Dr. Bergen brought plaintiff's competency issues to the MEC before Dr. Bergen was apprised plaintiff wished to assert that dyslexia contributed to the adverse outcomes in the several cases noted, or that plaintiff was seeking reduced hours and supervision. Under these circumstances, plaintiff failed to demonstrate that at the time Dr. Bergen took the actions he did, he was conspiring with Flake to deny plaintiff his rights under the LAD. Further, plaintiff failed to allege sufficient facts to demonstrate the actions taken by Dr. Bergen and Flake were illegal and taken in concert. Thus, the judge did not err in dismissing plaintiff's claim for civil conspiracy.

60

In sum, having considered the record and mindful of our standards of review we are satisfied the trial court properly granted summary judgment to ARMC and correctly ordered the dismissal of plaintiff's claims against SJFMC and Flake.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0380-19